## IN THE UNITED STATES COURT
## FOR THE EASTERN DISTRICT OF PENNSYVLANIA

| | |
|---|---|
| **GORDON ROY PARKER,** | |
| Plaintiff | |
| v. | |
| **JACQUELINE FAYE GOLDHAGEN,** | **Case No: 15-cv-3304-TON** |
| Defendant | |

## ORDER

AND NOW, this _____ day of July, 2015, upon consideration of **Defendant's Rule 11 Motion For Sanctions,** It is hereby ORDERED that the motion is **denied** with prejudice.

_____  
J.

## IN THE UNITED STATES COURT
## FOR THE EASTERN DISTRICT OF PENNSYVLANIA

|  |  |  |
|---|---|---|
| **GORDON ROY PARKER,** | : |  |
| Plaintiff | : | |
| | : | |
| v. | : | |
| **JACQUELINE FAYE GOLDHAGEN,** | : | **Case No:  15-cv-3304-TON** |
| Defendant | : | |
| | : | |

## PLAINTIFF'S AMENDED RESPONSE TO
## DEFENDANT'S RULE 11 MOTION FOR SANCTIONS

**Plaintiff** Gordon Roy Parker ("Plaintiff"), in the above-styled action, submits this amended response to the instant motion, to account for evidence not available earlier.

### Executive Summary

In an all-out, no-expense-spared, no-holds-barred attempted character-assassination of Plaintiff, posing as a motion for Rule 11 sanctions, Defendant's name has been lent to her counsel's wholly separate, extracurricular participation in a malicious, vendetta-driven vigilantism secretly funded by an unnamed global feminist organization.  Put simply, and as the instant motion clearly demonstrates, defense counsel is little more than a thug with a law license, playing *white-knight* to a damsel-in-distress, making hostile, irrelevant, defamatory "water-cooler" arguments which serve more to prove Plaintiff's case than to refute it.

Defendant never intended to have to litigate this motion, as defense counsel's primary purpose was to blackmail Plaintiff into dropping this action under threat of a bogus litigation this lawsuit has repeatedly invited Defendant to file.

## Defense Averments

1.   DENIED.  Plaintiff has already stated that Defendant is an actress.  The remainder of the averment is subjective, conclusory, and more like pr/marketing copy.  To the extent the remainder is factual, it is DENIED.

2.   DENIED.  Plaintiff was fixated on Defendant's **hypnosis**.  He contacted her openly, honestly, under an easily searchable name (BettorOffSingle), He did this specifically because she had marketed herself as a **fetish model**, as this would guarantee Plaintiff a hypnotist who would not be offended by the (relatively mild) "sexy" content of the chess-improvement video (where winning is tied to the brain's attraction to beautiful women).  Defendant's fraudulent misrepresentation as a fetish model left her in a situation akin to her entering a stripclub, pretending to be a stripper, and being surprised when a male customer asks for a lapdance.  Moreover, sexiness and fixation on her body has been Defendant's meal-ticket in Hollywood for a decade.  Plaintiff was induced by Defendant into believing she was something she was not.

3.   DENIED.  Defendant is the sole aggressor here, having created a controversy by threatening Plaintiff with a defamation action.  Plaintiff had absolutely no intention of suing Defendant, and has done so only to preserve his free-speech rights, while "settling up" regarding the contract breach he otherwise wouldn't have bothered pursuing.  Regarding defense counsel's reference to "fantasy worlds," the protective, vigilante, truth-be-damned **white-knight** is a similarly creepy stock character.

4.   DENIED.  Defendant's reliance on hearsay and internet defamation -- in a federal court pleading, no less -- serves only to further Plaintiff's arguments, while all but proving common-law malice and reckless disregard for the truth.  The "information" upon which Defendant relies was placed there by others with an axe to grind against Plaintiff.  To the extent

2

a response is required, Defendant's claim that Plaintiff's posting to third-party websites concerning Defendant is harassment is not legally valid, as this is simple free speech in a public square, not direct contact. Even if it were direct contact, it was not harassment, but commentary on two legitimate issues of public concern: a) a SAG-AFTRA actress offering custom fetish videos; and b) the relative value of alternative medicine. Absolutely no harassment was intended or committed. By contrast, Defendant's conduct, including linking to a site which falsely warns the public that Plaintiff is a dangerous pedophile, with his physical location and picture, constitutes federal *cyberstalking* which is not even immune under Section 230.

5.   DENIED. The averment is conclusory and requires no response. To the extent it requires a response, it is DENIED.

6.   DENIED. The averments are conclusory, and require no response. To the extent they are not conclusory, they are DENIED. Specifically:

a)   DENIED. But for Defendant's litigation threat, Plaintiff would never have filed suit. Defendant is fully aware that the very ED page over which Plaintiff is suing, and those tied to it, will spread her Rule 11 allegations, a *dog-whistle* for vigilantes to harass Plaintiff on her behalf (one already has by sending a threatening Yelp message). Defendant *ordered* Plaintiff to chill his speech or face a lawsuit, not realizing that this opened herself up to being sued.

b)   DENIED. Defendant surely knows a great deal about improper purposes, as its counsel is (according to itself) being paid for by an unnamed feminist organization with a preexisting dislike of Plaintiff, who injected itself into this action after the harried Defendant realized she had bitten off more than she could chew with her initial cease-and-desist SLAPP warning to Plaintiff.

c)   DENIED. Plaintiff Kettle asserts that Defendant Pot's reasoning is unsound.

3

d)   DENIED.  Plaintiff 1) derives little or no revenue from his work as a "PUA"

coach or author; 2) but for feminists similar to the ones bankrolling Defendant repeatedly

blaming PUAs for crimes like Elliot Rodger, Plaintiff's work would be on the backburner; and 3)

Defendant attended the *premiere* of a "PUA" movie, ***The Wingman***, in 2014, with her then-

boyfriend, director Derek Wayne Johnson:



7.  DENIED.  The averment is conclusory; to the extent it is factual, it is DENIED.

8.  DENIED.  Plaintiff has every right to disseminate the lawsuit he filed to rebut

Defendant's statements, and her attempt to chill his speech on Yelp, social media, and other

websites.  Defense had threatened a classic SLAPP action, one which would also violate the

Dragonetti Act. Plaintiff has merely called her bluff, invited her to try her claim, and she has

responded with an attempted Rule 11 character-assassination based on cynical gender

stereotypes.

9.  DENIED.  Defendant was the aggressor against Plaintiff, ignoring his warning not to

contact her by e-mailing him three consecutive times thereafter, prompting Plaintiff to speak out.

Even after receiving this lawsuit by e-mail, Defendant repeatedly engaged Plaintiff, not only

initiating contact, but doing so in a manner which suggested a desire to resolve this issue

"without courts or lawyers."  ***She even offered to make him <u>three</u> videos*** for free, well after she

supposedly took offense at his "deviance."  As these videos were now worthless to Plaintiff,

particularly after the trauma-inducing link to the ED-page, he declined.  This is an e-mail from

Defendant to Plaintiff, on ***June 12***, 2015:



This is the full text of the e-mail:

Hello Ray-

*I tried to call you.* First off I am not an active member on that site as I explained it to you I never figured out how to use it and I have a paper trail with them asking them to cancel it on numerous occasions. (I can send those as well) Here's the truth I recently started my own hypnotherapy practice because I love helping people and it is truly rewarding for me unlike acting or modeling. *Yes I have done fetish modeling* in my past I won't deny that that's why I originally joined the site. But *hypnosis saved me from spending the next decade of my life being a softcore actress* and it truly makes me feel fulfilled to help people. When you attacked my yelp I didn't sleep for a night because that was my baby and it meant the world to me. *I apologize for posting that link* and that's why I posted another rebuttal stating I do not know if the facts are true.

*I would like to settle this without a court and without lawyers.* If there is a way we could both have that ripoff review removed then let's figure out a way. Do you want a video? Is this what this is all about. Fine *I'll tell you what I'll make you a video free of charge. I am an amazing hypnotist and you know that. So yes I will make you an amazing video! Hell I'll make you 3.* Just stop with the harassment stop with law suits.

Sincerely
Jacqueline Holland
818-521-7971  (Emphasis Added)

10.   Averments 10, and 10a-h are DENIED.  The averments 10(a-h) are conclusory; to the extent they are not conclusory, they are DENIED.  Specifically:

a)   DENIED.  By way of further answer, Defendant was contracted specifically because she was sexy, and markets her sexuality extensively.  The *Customs Club* website caters to "deviant" men, and Defendant had willingly participated on the site.  Further, Defendant deliberately uses her sexuality to market her "vanilla" hypnotherapy practice to hypnofetishists, who create pretexts for therapy.  Had Defendant not fraudulently misrepresented herself to Plaintiff, she would never have attracted his attention in the first place.  Even with his attention, once it became clear she wanted no contact, Plaintiff moved on, as he had attempted to the moment the contract was breached.

6

b-h) DENIED.  To the extent any of these averments are true, Defendant is merely stating the irrelevant obvious about why Plaintiff contracted for the video.  The conclusory allegations based on this obvious are denied.

FN3.  Defendant again imputes upon Plaintiff, the nonexistent desire for personal interaction.  The entire purpose of the video was the opposite, and the *only* time Plaintiff contacted Defendant was at *her* urging, under false pretense of settling this case.  Plaintiff has offered her counsel a *mutual, lifetime restraining order* that prohibits being within 100 feet, calling, or directly e-mailing Defendant (and vice versa).  Defendant, of course, wants to *censor* Plaintiff completely, something even victory in this lawsuit would not guarantee.

11.  DENIED.  The averment is conclusory, requiring no response; to the extent it is not conclusory, it is DENIED.  Specifically:

a-b)  DENIED.  Defendant called out Plaintiff with an accusation dating back to 1997; Plaintiff was merely rebutting her link, and clearing his name.  Defendant brought those events into controversy.

c)   DENIED.  None of Plaintiff's lawsuits have ever been deemed frivolous, nor has Plaintiff ever been sanctioned under Rule 11.  He was praised for legal clarity in the Yahoo case by Judge McLaughlin, and prevailed (settlement) in that case.  Of course, recently, defense counsel in Parker v. Kelly Services, Inc. (15-cv-3337) boldly, and wrongly, declared that Kelly Services, a federal contractor, was not covered by the Rehabilitation Act, when anyone who had seen the movie *Philadelphia* should have known otherwise.

d-e)  DENIED.  The averment is denied as moot; Plaintiff has amended the Complaint.

7

12.   DENIED.  Defendant's argument is literally *impossible:* she threatened a libel action against Plaintiff, which *must* be heard in Pennsylvania.  Either a) her threat was baseless and fraudulent; or b) she was prepared to voluntarily submit to the jurisdiction of this Court in order to sue Plaintiff, who is merely suing her first under the Declaratory Judgment Act, in the very court which would rule on her threatened libel action.  The *only* way Defendant could not be subject to jurisdiction in Pennsylvania would be for her to permanently waive her right to sue for any and all alleged defamation up to and including the present.

13.   DENIED.  The libel count is a legitimate constitutional challenge to 47 USC §230, which, *according to various internet websites and Google links*, is unpopular, particularly among victims of "revenge porn," women who would never have been victimized had Plaintiff's prior lawsuits been dismissed.

14.   DENIED.  The averment is conclusory, requiring no response; to the extent it requires a response, it is DENIED.  The only possible constitutionally sound application of Section 230 would require an affirmative showing of third-party authorship.  An simple affidavit from Defendant to this effect would suffice.  In this case, there is genuine doubt that 230 immunity would survive, even if not overturned.  Moreover, Plaintiff has alleged in the Amended Complaint (¶24) that Defendant a) made the statements her own; and b) added her own defamatory statements in addition to the ED link.

15.   DENIED.  The averment is conclusory; to the extent it is factual, it is DENIED.  By way of further answer, a breach of contract claim has been properly pled.

16.   DENIED.  There is no factual averment to which a response is required; to the extent there is, it is DENIED.

17.   DENIED.  The averment is conclusory; to the extent it is factual, it is denied. Specifically:

    a)   DENIED.  The record does not support this claim.

    b)   DENIED.  Defendant is not a mindreader, nor do the facts support its claim.

    c)   DENIED.  Defendant is not a mindreader, though Plaintiff would be willing to test his theory if Defendant would be willing to fund the attempt.

    d-e)  DENIED.  By way of further answer, 1) the other cases did not involve people who had threatened litigation in this jurisdiction, and 2) none of Plaintiff's cases have ever been declared frivolous or vexatious.

18.   DENIED.

### Additional Averments

19.   Plaintiff had only contacted Defendant because *she* had reached out to him to settle the case.  Once he realized she had no interest in doing so, he ceased all contact, resigning himself to this litigation.

20.   Just prior to filing the instant motion, defense counsel invited Plaintiff to call him, during which time he a) verbally abused Plaintiff, b) said that a "global organization" was funding Defendant's lawsuit (after she paid a certain amount), c) that this organization was preparing to jurisdiction-blitz Plaintiff with global lawsuits, including an unspecified one from Defendant, without attempting mitigation by putting Plaintiff on further notice regarding these allegedly impending actions.  Defendant offered to drop all claims if Plaintiff did the same and agreed to permanent self-censorship regarding Defendant.

21.   Contrary to Defendant's assertions, there are *two* separate public-interest motivations for Plaintiff's speech.  The first is the convergence of Hollywood, the internet, and the adult-

entertainment industry, with Defendant having placed herself into its epicenter, while the second is the much more serious issue of a "fetish" hypnotist performing stage hypnosis to an *underaged* audience at school events.

22.   Plaintiff is a known whistleblower, on SSDI, and currently in their ***ticket to work*** program. He avers, on information and belief, that the various lawfirms in this and previous actions have conducted themselves with an eye towards enforcing a blacklist on Plaintiff's potential lawfirm employment, by using the litigation to create conflicts which would preclude his employment with them, even through ***ticket to work***. This creates an irreparable conflict of interest for any defense counsel which is a potential employer of Plaintiff's and a federal contractor; this is argued in a concurrent motion to disqualify defense counsel.

A Memorandum in support is attached.

This the 9th day of July, 2015.

Gordon Roy Parker, Pro Se
4247 Locust Street, #119
Philadelphia, PA 19104
(267) 298-1257
SnodgrassPublish@aol.com
**PLAINTIFF**

## IN THE UNITED STATES COURT
## FOR THE EASTERN DISTRICT OF PENNSYVLANIA

| | | |
|---|---|---|
| **GORDON ROY PARKER,** | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| **JACQUELINE FAYE GOLDHAGEN,** | : | Case No: 15-cv-3304-TON |
| **Defendant** | : | |
| | : | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S RESPONSE
## TO DEFENDANT'S RULE 11 MOTION FOR SANCTIONS

Plaintiff Gordon Roy Parker, in the above-styled action, submits this Memorandum in Support of his opposition to the instant motion.

## BACKGROUND

Defense counsel has vilified Plaintiff as vexatious and frivolous, yet Plaintiff is not the lawyer in good standing who has misconstrued the Rehabilitation Act.

The instant motion is a desperate attempt to completely circumvent due process. Although Defendant claimed in its motion that a motion to dismiss was concurrently filed, Plaintiff has yet to locate it on PACER and has not yet otherwise been served. Without dismissal, Rule 11 sanctions are impossible. Defendant has placed a cart of explosives in front of the horse in the hope of literally blowing up this case in its favor.

## LEGAL STANDARD

This is quickly becoming a complex civil litigation. Plaintiff preserves any and all defenses and claims not set forth here, for future use, should the need arise.

## I.    DECLARATORY JUDGMENT ACT

A party seeking declaratory relief under the DJA must present an "actual controversy" in order to satisfy the "case or controversy" requirement of Article III.  It allows prospective defendants to sue to establish their nonliability and afford[s] a party threatened with liability an opportunity for adjudication before its adversary commences litigation. *Federal Practice Manual For Legal Aid Attorneys,* ¶9.3

## II.    RULE 11 MOTION FOR SANCTIONS

### A.    General.

"***Rule 11 is not a fee-shifting statute.***" see Pavelic & LeFlore v. Marvel Entm't Group, 493 US 120 (1989).  Rule 11 sanctions are an extreme measure, and should rarely be granted. That a lawsuit does not prevail does not automatically make it run afoul of Rule 11.

A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b). The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets. If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion.  FRCP 11(c)(2)

A sanction imposed under this rule must be ***limited to what suffices to deter repetition of the conduct*** or comparable conduct by others similarly situated. FRCP 11(c)(4).

### B.    Rule 11 And Vexatious Litigation

Under [Defendant's home state of] California Code of Civil Procedure section 391(b), a vexatious litigant is defined as one who, while acting pro se, has done any of the following:

> (1) In the immediately preceding seven-year period has commenced, prosecuted, or maintained in propia persona at least five litigations other than in a small

claims court that have been (i) finally determined adversely to the person or (ii) unjustifiably permitted to remain pending at least two years without having been brought to trial or a hearing.

(2) After a litigation has been finally determined against the person, repeatedly relitigates or attempts to relitigate, in propia persona, either (i) the validity of the determination against the same defendant or defendants as to whom the litigation was finally determined or (ii) the cause of action, claim, controversy, or any of the issues of fact or law, determined or concluded by the final determination against the same defendant or defendants as to whom the litigation was finally determined.

(3) In any litigation while acting in propia persona, repeatedly files unmeritorious motions, pleadings, or other papers, conducts unnecessary discovery, or engages in other tactics that are frivolous or solely intended to cause unnecessary delay.

(4) Has previously been declared to be a vexatious litigant by any state or federal court of record in any action or proceeding based upon the same or substantially similar facts, transaction, or occurrence. Cruz v. Tilton et al., 06-CV-00883, E.D.Ca.

There is no such thing as a vexatious tortfeasor.

Plaintiff not only **_won_** his last case (Rule 41 settlement without sanctions is a win for the Plaintiff), but held his own against Microsoft, Yahoo, and the nation's most expensive, litigious IP attorneys (see Exhibit A), who rode the Acela back to their offices with their heads buried in their laptops to hide the shame of having been completely outlawered by a "vexatious, serial-litigant" pro se.

## C.   Rule 11 and Jurisdictional Waiver

In TES Franchising, C v. J Eric Dombach, No CIVA, 10-0017, 2010 WL 5023249 at *3 (EDPA 12/9/2010), the Court held that the jurisdictional defense was not waived, but deferred ruling on the Rule 11 motion until the Rule 12(b) motion to dismiss was heard; despite Defendant's claim to the contrary in the instant motion, no such motion to dismiss has concurrently been filed.

When a defendant makes it abundantly clear that it is attempting to litigate on the merits, however, jurisdictional objections are deemed waived. See, e.g., Gerber v. Riordan, 649 F.3d 514 (6th Cir. 2011). The Gerber court further held that a rule 11 motion would not be heard until after a traditional motion to dismiss. Also from Gerber:

> "Defendants' filing of a general appearance with the district court constituted a voluntary acceptance of the district court's jurisdiction, and therefore, a waiver of Defendants' personal jurisdiction defense. We have held that "Under [Federal Rule of Civil Procedure] 12(h), a party waives the right to contest personal jurisdiction by failing to raise the issue when making a responsive pleading or a general appearance." *Id.* at 1120; *accord Baragona v. Kuwait Gulf Link Transp. Co.*, 594 F.3d 852, 854 (11th Cir. 2010) ("A defendant normally . . . waives a personal jurisdiction defense if he or she has entered an appearance."); *Ladder Man, Inc. v. Mfr.'s Distrib. Serv., Inc.*, No. 99-4217, 2000 U.S. App. LEXIS 27982, at *7 (6th Cir. Oct. 31, No. 09-3790 *Gerber v. Riordan, et al.* Page 10 2000) (table). Therefore, Defendants' attorney's entry of a general appearance with the district court on behalf of Defendants on October 16, 2006 constituted a waiver of Defendants' personal jurisdiction defense.

## III. **SECTION 230 AND DEFAMATION**

The elements of a defamation claim are a 1) false statement that Defendant either 2) knew or should have known was false, 3) wasn't privileged or consented to, 4) was communicated to a third party, 5) who understood its defamatory context, causing 6) pecuniary harm (generic citations omitted). For public figures, Times v. Sullivan (citation omitted) is the guiding precedent regarding actual malice. In Pennsylvania, "common-law malice" must also be present with a public figure. (citation omitted).

The key issue in this case is 47 USC §230(c) ("Section 230 immunity"), which applies to all third-party internet content. Specifically, this defamation claim will turn on Paul v. Davis, 424 U.S. 693 (1976), in which the dissent held that a constitutional right to reputation existed by itself, and the majority held that libel was a constitutional harm if, and only if, it resulted in a "secondary constitutional harm," such as loss of employment. Had this bedrock case been ruled upon in the present, an era where people determine reputations based on "websites and links to

4

Google search results," it would have gone 9-0 in favor of establishing the right, one similar to

the right to privacy, and a right recognized almost universally in the developed world, save for

the United States' abominable immunity.

In Australia and the UK, not only is Section 230 immunity not recognized, but the ***right to***

***be forgotten*** is considered a basic human right.  In the United States, the Supreme Court has yet

to rule on Section 230.  Plaintiff's interpretation of the law is that it cannot be used as a "sword,"

but rather only as a "shield," nor can it run afoul of his asserted constitutional right to reputation.

## IV.   BREACH OF CONTRACT

One of the most phenomenal legal minds of our time, Casey B. Green (defense counsel's

son), perfectly explained the elements of a breach-of-contract claim in Pennsylvania:

> In Pennsylvania, a breach of contract action involves *(1) the  existence of a contract, (2) a*
> *breach of a duty imposed by the contract, and (3) damages*.  J.F. Walker Co., Inc. v.
> Excalibur Oil Group, Inc.,792  A.2d 1269 (Pa.Super.2002). Additionally, it is axiomatic that a
> contract may be manifest orally, in writing, or as an inference from the  acts and conduct of
> the parties. John Edward Murray, Jr., Cases and  Materials on Contracts 184 (3rd ed.1983)
> (citation omitted).
>
> ***The purpose of damages is to put the plaintiff in the position he or she would have been in***
> ***but for the breach.*** Maxwell v. Schaefer, 381 Pa. 13, 21, 112 A.2d 69, 73 (1955); Harman v.
> Chambers, 358 Pa. 516, 521, 57 A.2d 842, 845 (1948); Mancini v. Morrow,  312 Pa.Super.
> 192, 204, 458 A.2d 580, 586 (1983). The measure of recovery and the method of evaluation
> that are adopted should in every case be so adjusted as to attain as nearly as possible the
> purpose of our system of remedial justice. This purpose is to ***put the injured party in as good***
> ***a position as the*** ***promised performance*** ***would have put him***, having regard both to the
> reasonable foreseeability of the harm and to the extent that it could reasonably have been
> avoided by the injured party himself.  5 Corbin on Contracts § 1005 at 63 (1951).
>
> *(From http://contracts.lawyers.com/blogs/archives/18526-the-basics-elements-of-a-breach-of-*
> *contract-action-pennsylvania.html (retrieved July 1, 2015 2:26pm).*

Plaintiff couldn't have said it better himself, and in this case what we have is the breach of,

literally, a "promised performance."

## V.   FRAUDULENT/NEGLIGENT MISREPRESENTATION

Under Pennsylvania law, a fraudulent misrepresentation claim has six elements: "(1) a

representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." Bouriez v. Carnegie Mellon Univ., 585 F.3d 8 765, 771 (3d Cir. 2009) (citing Overall v. Univ. of Pa., 412 F.3d 492, 498 (3d Cir. 2005).

A party alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The Third Circuit has held that to satisfy Rule 9(b), a plaintiff must "state the circumstances of the alleged fraud with sufficient particularity to place a defendant on notice of the 'precise misconduct with which [it is] charged.'" Dimare v. Metlife Insurance Co., 369 Fed. App'x 324, at *329 (3d Cir. 2010) (quoting Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007) (alteration in original). "This requires a plaintiff to either plead the date, time, and place of the alleged fraud, or inject precision into the allegations by some alternative means." Dimare, 369 Fed. App'x at *329.

## **ARGUMENT**

Defense counsel "outwitted" Plaintiff into apparently waiving his twenty-one day notice period for the instant motion, but since he has no intention of withdrawing the Complaint, and is moving as swiftly as possible at every step in this litigation in the hope of a swift resolution, he will waive his twenty-one day objection, but not the objection based on a "minor" technicality: ***Defendant has not yet won this case***. This motion should be stayed until such time as Defendant prevails.

Plaintiff has also filed a concurrent motion to strike the instant motion, based on its putrid attempted character-assassination of Plaintiff, with so many language violations that it would

6

almost be quicker to point out the parts which are not prejudicial, slanderous, false, or otherwise strike-worthy.

## I.   **EARLY SCRUTINY/JURISDICTION**

Defendant claims that her location in California demands early scrutiny, yet Defendant, *on her own initiative*, threatened Plaintiff with a libel action, her cease-and-desist order giving rise to Plaintiff's claim under the Declaratory Judgment Act.

Plaintiff's argument is simple: either a) there is no defamation controversy, and Defendant's threatened defamation action is prejudicially waived; or b) there *is* a controversy over which the Declaratory Judgment Act gives jurisdiction.  It must be one or the other.

## II.   **VEXATIOUS LITIGATION**

Plaintiff does not even come close to meeting any of the elements set forth in Section II for the legal standard for vexatiousness: he has not lost multiple lawsuits in recent years (he won his last two), he has properly pled valid claims for relief in every action, some of his actions are whistleblower and public-interest lawsuits where resolution of the law is as important as the outcome (the <u>Google</u> judge noted that Plaintiff's case was an issue of first impression, while taking Plaintiff at his word that he would not vexate the issue).  Indeed, in <u>Parker v. Yahoo</u>, Plaintiff "overturned" the <u>Google</u> ruling regarding implied license, overcoming what appeared to be a slam-dunk issue-preclusion argument by the defense (see Exhibit A).

Given that Plaintiff would never have sued Defendant, but for her threat to sue him first, it is not possible for him to be ruled vexatious; he is permitted to vigorously defend his rights when cornered.  The instant motion amounts to the whining of a bully who is incredulous that his (or her) target stood his ground.  It also represents the hidden agenda of a large,

unnamed, global feminist organization which apparently has "had it in" for Plaintiff for quite some time, according to defense counsel.

### III.  IMPROPER PURPOSE (HARASSMENT)

Defendant is accusing Plaintiff of attempting to extort her into having a relationship.  There is absolutely no evidence on (or off) the record to support this claim; it is simply untrue. Defendant's conduct, as set forth in Plaintiff's response to the instant motion, actually supports this claim more in reverse.

### A.  Defendant, Not Plaintiff, Is Vexatious.

Defendant is arguing that Plaintiff is using a process initiated by *her* to "force his way into her daily life."  If so, Plaintiff's mind-control powers exceed Defendant's by a factor of one hundred.  He had no intention of litigating this matter prior to the cease-and-desist threat.  Had Plaintiff wanted a relationship with Defendant, he could easily have visited her for a live session under pretext, like most of her male clientele. By this point, Defendant disgusts Plaintiff, and he would rather this litigation be fast-tracked as much as possible.

### B.  Plaintiff Was Not Attempting To Force A Relationship.

Defendant repeats this allegation yet again, yet it has no basis in fact.  The transactional history clearly indicates that Defendant has contacted Plaintiff personally, despite being asked not to, and that Plaintiff has done no more than speak *about* Defendant, not *to* her. She is attempting to stifle his first-amendment rights with a repeat of a defamatory statement which gave rise to the defamation claim (ACmplt, ¶24).

Even more curious about this allegation is that defense counsel has recently e-mailed Plaintiff, informing him that Defendant is going to sue him (for unspecified conduct), in an uncertain jurisdiction, thus further involving him in her life, completely involuntarily on his part.

Plaintiff would love nothing more than a swift, just resolution to this action so that all parties may continue on with their lives.  What Defendant wants, however, is to silence Plaintiff's free speech, which she knows she cannot accomplish without the false imputation of a nonexistent romantic obsession for a thirty-four year-old actress whose career is fading so rapidly that, in her own words, hypnosis is all that stands between her and a career in softcore pornography.

**C.   Extracurricular Publication Of Complaint.**

This lawsuit is newsworthy on many fronts, and will become increasingly so. Plaintiff's "haters" have waited, *en masse*, for someone to "take him down," and Defendant is the pawn which has been sent into enemy territory.  Ironically, the instant motion found its way onto scribd.com at 8:07 pm the day it was filed:



Internet coverage and dissemination of lawsuits are a fact of modern life; Plaintiff has sued to restore his reputation, and part of that is raising public awareness about the suit, which has an even bigger audience of those interested in litigation relating to Yelp reviews and the level

9

of protection which should be afforded that speech. Defendant voluntarily opened this can of worms.

### D. Plaintiff's PUA Business Is Irrelevant.

Defendant has misconstrued everything from the nature of Plaintiff's dating-advice business, to its scant income (less than $20 a month), to the fact that Plaintiff no longer markets his work, except passively. It is free because his work has been plagiarized to death, including by Hollywood (*The Game* and *VH-1's The Pickup Artist*). Defendant's partner, Erika Jordan, has appeared on a PUA video for the much-maligned *Real Social Dynamics* (a competitor), while Defendant herself has played characters in fiction based either directly or indirectly on Plaintiff's writing. None of this is relevant, however, as this has never been a factor in any transaction in controversy; Plaintiff was merely attempting to secure a hypnosis video for chess improvement.

Defendant's *stars-in-his-eyes* argument concerning Plaintiff fails any reality test. Unlike his PUA rivals, who hire "paid to party" women like Defendant and Erika Jordan to boost their images (Plaintiff calls them *Random Hot Chicks*), Plaintiff is a "true indie" unfazed by fame and status. His half-brother was married to Michael Learned, wrote an episode of *The Waltons*, and was one of the head writers on *Nurse*, before leaving the industry. In 1984, Kenneth Anger saw Plaintiff on the street and offered him the lead in *Lucifer Rising II*. Diane Lane dated Plaintiff's cousin for three years in the 1980s and Plaintiff shared a lone holiday meal with her rather than hit on her or "network her." Plaintiff had more than enough connections to fame from an early age to exploit at his mercy.

If anyone has stars in their eyes, it is more likely defense counsel, who may be projecting *his own fantasies* onto Plaintiff to justify his utility to Defendant. This would not be the first

time something like this has occurred; indeed, the "pedophile" essay in controversy here was once republished by Derek "Odious" Trunk, who imputed pedophilia on Plaintiff, and who is now serving seventy-five months in federal prison for trafficking in child pornography. Who protects us from our protectors is as valid as question as any.

## IV. COGNIZANT CLAIMS HAVE BEEN PLED

Defendant argues the absence of a cognizable claim by Plaintiff. The only way this could be possible is if Defendant has no intention of carrying out its threat to commence an action for Defamation, for which Plaintiff has extended this invitation. Absent this threat, this lawsuit would not exist. A cognizant claim for declaratory relief most certainly does exist; this claim is therefore cognizant.

### A. A Cognizant Claim For Breach Of Contract Was Alleged.

Defendant claims that, because no money changed hands, a valid contract did not exist. This is wrong on its face, particularly since the money would have changed hands were it not for the breach. The underlying question seems akin to whether or not Plaintiff had grounds for terminating the contract due to Defendant's conduct, and his subsequent lack of trust in her, which has made suing for simple performance of the hypnosis video an inadequate remedy. Defendant claims she was unaffiliated with *Customs Club*, which implies that they fraudulently misrepresented to Plaintiff that she had. Despite this, it is *Plaintiff* who Defendant has targeted with her attorneys, while strangely leaving *Customs Club* untouched.

The three basic elements are clearly met; the main question is interpretation and measure of damages and remedies. Plaintiff knows that for $325,000.00 he will have no difficulty finding someone to work with him; indeed, Defendant agreed to do so for $1,000.00.

11

Defendant's allegation of an ***uncommunicated fantasy*** was the hallucination, as Plaintiff held no such fantasy. Rather, his reference to ***potentially*** commercializing their collaborative hypnosis work was listed among the damages. As "songwriter" and "singer," had the custom video had an extreme market value, it is always possible that Defendant would further license the work. That her partner, Erika Jordan, has done "PUA" videos (Defendant grossly mischaracterizes Plaintiff's work), and that Defendant has "booked everything" for the past year, plus the ***binding contract*** to produce one video, makes this claim real and legit. Other damages include the loss of the video itself, and its enjoyment, much like a concert which is cancelled. The level of damages should be decided by a jury.

**B.  A Cognizant Claim For Defamation Was Pled.**

This lawsuit is a constitutional, ***as-applied*** challenge to 47 USC §230, made in good faith.

**C.  A Cognizant Claim For Fraudulent Misrepresentation Was Alleged**

Plaintiff's damages for having been essentially ***catfished*** by a woman fraudulently or negatively misrepresenting herself as an adult entertainer are the easiest to quantify and describe. But for the fraud, Plaintiff would never have opened up to Defendant, never solicited her for the video, and never engaged in any of what he thought was welcomed conduct for which Defendant later chastised him, misdirecting her anger that should have been focused on ***Customs Club***, the true "villain" of this saga. Because Defendant willingly contracted with them, and cannot erase her past, she has waged all-out internet and judicial war with Plaintiff in an attempt to silence his attempt to do the opposite, well within his First Amendment rights.

### Plaintiff Is Not "Mentally And Physically Unfit To Work Or Do Business"

Defendant has taken pleadings from other lawsuits, often spoken in character, and deliberately misconstrued them to suit its malicious agenda.

Defense counsel claims that its client would never "dream" of doing business with Plaintiff, yet she had done just that. After cheating Plaintiff out of a chunk of his **$867.00** SSDI check, Defendant -- a federal contractor in a city where Plaintiff is in the **ticket to work** program -- avers that Plaintiff is "**certainly not physically or mentally fit to undertake any ambitious business deal.**" (Memo, p.17). The Social Security Administration disagrees, as it has qualified Plaintiff for its **ticket to work** program. Defense counsel, a federal contractor and potential employer of Plaintiff, is attempting to achieve the extrajudicial objective of blacklisting Plaintiff from office work. As the UPenn case (which Plaintiff recently moved to reopen) develops, much more will become clear.

### "Hypnosis She Could Have Performed In Front Of Her Mother"

In its Memorandum, Defendant characterizes the chess-hypnosis video as something she "could have performed in front of her mother." **When Harry Met Sally** jokes notwithstanding, Defendant's breach of her fiduciary duty to Customs Club and the contract occurred **before** she had received the script, which involved "extreme PG-13 hypnosis" with similar costuming, voice, and movement to that displayed in her bread-and-butter "**Skinemax**" roles. Though hardly as extreme as the "fetish" requests (e.g,. Exhibit 8) she attempts to blame Plaintiff for (in)directing her way with his commentary (rather than her own conduct), the chess video was anything but tame; it was just **sexy**, with the beauty playing a legitimate role in the "therapy," rather than crude.

### D. JURSIDICTION IS PROPER

See the argument on Rule 11 and Jurisdiction, which applies here. Even without the Declaratory Relief Act, alternative jurisdiction is conveyed numerous ways: i.e., damage occurring in Philadelphia, the contract between the parties, etc., to be fleshed out when Defendant actually moves for dismissal on those grounds. Defendant, while claiming not to have filed suit here, has entered a general appearance, and has **promised** to file a libel action; Plaintiff merely readied the venue for her entrance, but Defendant is fashionably late to making the claim.

The case cited smugly by Defendants, <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 US 286, had to do with tires which caused an accident while on the road in a state with which the tiremaker had no contacts, and certainly does not apply here. The damage to Plaintiff from the cease-and-desist was felt here, since Plaintiff will have to defend such action here. Defendant, not Plaintiff, haled **herself** into this jurisdiction.

## V. SANCTIONS ARE INAPPROPRIATE

If anyone should be sanctioned, it is defense counsel in <u>Parker v. Kelly Services, Inc.</u>, for wasting Plaintiff's and the Court's energy on an incorrect legal position. By contrast, Defendant's unsound, irrelevant, and factually inaccurate arguments do not justify so much as a single sanction against Plaintiff. Indeed, it is the instant motion which runs afoul of Rule 11, part of a much larger, more vicious campaign to exterminate Plaintiff's free speech by, as Defense counsel put it, "taking away his computer and his shoes." Someone should tell Defense counsel that poverty does not work that way, though Defendant has never truly established that Plaintiff is even in fact poor.

## VI.  **CONCLUSION**

For the foregoing reasons, the instant motion should be **denied**.  A form of order is

attached, as are concurrent motions to disqualify counsel, and to strike the pleading.

This the 9th day of July, 2015

Gordon Roy Parker, Pro Se
4247 Locust Street, #119
Philadelphia, PA 19104
(267) 298-1257
SnodgrassPublish@aol.com
**PLAINTIFF**

15

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

GORDON ROY PARKER,            )    07-CR-2757
                                 )
      Plaintiff,           )
                                 )
    vs.                     )
                                 )
YAHOO, INC., et al,       )    Philadelphia, PA
                               )    January 27, 2009
      Defendant.          )    9:29 a.m.

TRANSCRIPT OF RULE 16 STATUS CONFERENCE
BEFORE THE HONORABLE MARY A. McLAUGHLIN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:       GORDON ROY PARKER, PRO SE

For the Defendant        THOMAS P. LANE, ESQUIRE
Yahoo:                   WINSTON & STRAWN, LLP
                         200 Park Avenue
                         New York, NY  10166

For the Defendant        JEREMY MISHKIN, ESQUIRE
Microsoft:             MONTGOMERY, McCRACKEN, WALKER &
                         RHOADS, LLP
                         123 South Broad Street
                         Philadelphia, PA  19109

Audio Operator:         RAYMOND WOLF

Transcribed by:         DIANA DOMAN TRANSCRIBING
                         P.O. Box 129
                         Gibbsboro, New Jersey  08026-0129
                         Office:  (856) 435-7172
                         Fax:    (856)  435-7124
                         E-mail:  Dianadoman@comcast.net

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

Case 2:15-cv-03304-TON   Document 9   Filed 07/09/15   Page 28 of 69
Case 2:07-cv-02757-MAM   Document 45   Filed 02/05/09   Page 2 of 42

2

I N D E X

SUMMARY OF THE CASE:                          PAGE NUMBER

  By Judge McLaughlin                              3


YAHOO - SETTLEMENT:                           PAGE NUMBER

  By Mr. Lane                                      5


ARGUMENTS:                                    PAGE NUMBER

  By Mr. Parker                              7,   20,  28

  By Mr. Mishkin                             12,  19,  26

                                              PAGE NUMBER

Summary of the Case by the Court                                    3

1              (The following was heard in open court at 9:29 a.m.)

2              COURTROOM DEPUTY:  All rise.

3              THE COURT:  Good morning everyone.

4              MR. PARKER:  Good morning, Your Honor.

5              MR. LANE:  Good morning, Your Honor.

6              MR. MISHKIN:  Good morning, Your Honor.

7              THE COURT:  Please be seated.  All right, we're here

8    this morning of course in the case of the Gordon Ray

9    Parker --

10             MR. PARKER:  Roy.  I'm sorry.

11             THE COURT:  I'm sorry, sir?

12             MR. PARKER:  I'm sorry, it's Gordon Roy Parker.

13             THE COURT:  Oh, what did I say?  Ray?

14             MR. PARKER:  Ray.

15             THE COURT:  I'm so sorry.

16             MR. PARKER:  That's okay.

17             THE COURT:  Gordon Roy Parker versus Yahoo and

18   Microsoft Corporation and thanks, everybody, for being here.

19   Let me be sure I know everybody.  Obviously I know Mr. Parker

20   or remember Mr. Parker and Mr. Lane, this is Mr. Lane, and Mr.

21   -- sir, say your name again for me?

22             MR. MISHKIN:  My name is Jeremy Mishkin, Your Honor.

23             THE COURT:  Mishkin -- I'm so sorry.

24             MR. MISHKIN:  Yes, Your Honor.

25             THE COURT:  I couldn't read your handwriting there.

1    All right, counsel and Mr. Parker, the purpose of this

2    morning's hearing -- it's not a hearing really but a

3    conference and we're doing it on the record because obviously

4    Mr. Parker is pro se so I think it's important that we do

5    that, is to discuss a schedule for the case.

6              Now as I look at all the materials and the papers,

7    and of course my earlier decision, what we have left is the

8    plaintiff's claim of direct copyright infringement based on

9    any continued display or use of his works after the filing of

10   the lawsuit, because everything else I had dismissed, and then

11   we have various counterclaims by the defendants against Mr.

12   Parker.  Mr. Parker, is that your understanding of what's

13   left?

14             MR. PARKER:  Did you get my amended Rule 16?  I

15   filed something on Friday, something that was bare bones

16   because I couldn't find the form and I re-did it over the

17   weekend.

18             THE COURT:  Yes, I think we have it, yes.

19             MR. PARKER:  Okay.

20             THE COURT:  Did I -- just for the record, though,

21   did I state correctly what you believe the claims are that are

22   left?

23             MR. PARKER:  Well there are counterclaims, yes --

24             THE COURT:  Yes.

25             MR. PARKER:  -- and you dismissed all but the direct

Case 2:15-cv-03304-TON   Document 9   Filed 07/09/15   Page 31 of 69
Case 2:07-cv-02757-MAM   Document 45   Filed 02/05/09   Page 5 of 42
Lane - Settlement with Yahoo                                5

 1    infringement --

 2              THE COURT:  That's what I just said --

 3              MR. PARKER:  Yeah.

 4              THE COURT:  -- yes, okay.

 5              MR. PARKER:  Everything in accordance with your

 6    orders, yeah.

 7              THE COURT:  Mr. Lane, is that your understanding of

 8    what's left?

 9              MR. LANE:  It is, Your Honor, however, there's been

10    a development this morning.

11              THE COURT:  Oh.

12              MR. LANE:  Yahoo has settled with Mr. Parker --

13              MR. PARKER:  Pending your approval --

14              MR. LANE:  -- pending the Court's approval of course

15    and both sides have agreed to dismiss their claims.

16              THE COURT:  Okay.  Okay, do I need to approve it?

17              MR. LANE:  I have a --

18              THE COURT:  Am I missing something here?

19              MR. LANE:  I just got the executed so ordered copy

20    of it.

21              THE COURT:  Okay, sure.

22              MR. LANE:  I'd like to hand that up to the Court.

23              THE COURT:  Sure, why don't you just hand it up.  So

24    this is Mr. Mishkin -- no, Mr. Lane --

25              MR. LANE:  Yes.

Lane - Settlement with Yahoo                                    6

1          THE COURT:  Okay, so Mr. Lane from Yahoo -- let me

2   take that, all right -- yes, I don't even think I need to sign

3   it -- well I guess maybe I do because we have another

4   defendant.  I take it, Mr. Mishkin, you don't have any

5   objection to this?

6          MR. MISHKIN:  No, Your Honor, I have no objection.

7          THE COURT:  Okay.  I will sign it and I guess we can

8   excuse you, Mr. Lane, if you'd like to be excused.

9          MR. LANE:  I may just wait to talk to Mr. Mishkin

10  afterward --

11         THE COURT:  Of course.

12         MR. LANE:  -- but I appreciate the Court's time and

13  it's been a pleasure, Your Honor.

14         THE COURT:  More than welcome to have you stay.

15  Thank you very much --

16         MR. LANE:  Thank you.

17       , THE COURT:  -- also from my end as well.  Thank you

18  very much, Mr. Lane.  Okay, Mr. Mishkin, all right, is that

19  your understanding of what's left, Mr. Mishkin?

20         MR. MISHKIN:  Yes, Your Honor, and I don't obviously

21  know what the terms of this settlement are.  We did explore on

22  the telephone conference as per Your Honor's order the

23  possibility of settlement and I don't know whether the terms

24  that Mr. Parker has agreed to would be offered to my client as

25  well --

Case 2:15-cv-03304-TON   Document 9   Filed 07/09/15   Page 33 of 69
Case 2:07-cv-02757-MAM   Document 45   Filed 02/05/09   Page 7 of 42
Parker - Argument                                          7

1          THE COURT:  Right.

2          MR. MISHKIN:  -- nor what those terms are --

3          THE COURT:  Right.

4          MR. MISHKIN:  -- but I'd certainly be happy to

5    consider it --

6          THE COURT:  Right.

7          MR. MISHKIN:  -- and make sure my client gives it

8    consideration if they are.

9          THE COURT:  Sure.  Mr. Parker, are you prepared to

10   tell us what that is?

11         MR. PARKER:  No, because we have a different set of

12   facts here and if they want to make an offer, I believe Rule

13   68 covers that if they want to do it formally.  Informally, I

14   mean -- I generally -- I would leave it up to them to offer me

15   something.  I mean, I'm not looking to demand anything.

16         My main concern was to settle the copyright issue

17   which affects my own business as much as theirs because I

18   cannot go putting stuff on the internet until I know what --

19   what I -- the limits are.

20         The rules just haven't been laid down unless you go

21   by the old rules which were pre-internet where opt out isn't

22   there so the -- you know, the DMCA created a lot of clouds and

23   I have a -- I have an internet publishing company with a long

24   history of books that date back to 1998 websites so this

25   wasn't a minor issue.

Case 2:15-cv-03304-TON   Document 9   Filed 07/09/15   Page 34 of 69
Case 2:07-cv-02757-MAM   Document 45   Filed 02/05/09   Page 8 of 42
Parker - Argument                                    8

1          I have books coming out in the future which will

2   also be affected by these rulings so for me, it was more of an

3   issue just -- you know, again, I'd like to see the law

4   resolved as much as -- I have standing because it affects me

5   but -- you know, it's very common for companies to file the

6   declaratory just like they did or for damages as I did because

7   I believe there was a violation.

8          But absent the violation it's still beneficial I

9   think to all involved to get some kind of law like you laid

10  down.  I mean, you had a very extensive hearing.  The

11  <u>Publisher's Guild</u> case in New York was just polled (ph

12  9:33:36)-- I think settled for $125 million and what seems to

13  be happening is you get two classes of publishers here.

14          You get the big mainstream publishers who these

15  companies like Google don't go after or they settle and then

16  they cut a deal with them or people like me who can't fight

17  them so I'm somewhere -- I'm like in -- one foot in each world

18  where I have a standing, I have a case and some ability to

19  bring it -- I'm not saying -- you know --

20          THE COURT:  Okay, yes.

21          MR. PARKER:  I've worked in law offices before

22  enough to know how the system works.

23          THE COURT:  Sure, sure.  Well, Mr. Parker, though

24  tell me, putting aside whatever the settlement was with Mr.

25  Lane's client, I mean, normally what I do at a Rule 16

Case 2:15-cv-03304-TON   Document 9   Filed 07/09/15   Page 35 of 69
Case 2:07-cv-02757-MAM   Document 45   Filed 02/05/09   Page 9 of 42
Parker - Argument                                    9

 1    conference is say to the plaintiff  --

 2              MR. PARKER:  How much would I settle for?

 3              THE COURT:  Well not necessarily but what are you

 4    looking for in the case?

 5              MR. PARKER:  A win.

 6              THE COURT:  Not necessarily what you're settling but

 7    what is it that you're hoping to get out of this case?

 8              MR. PARKER:  Justice, a win, damages -- you know,

 9    standard --

10              THE COURT:  More specific.  More specific.

11              MR. PARKER:  What I outlined in the complaint.  I

12    mean, I believe my copyrights were violated, I believe that

13    what they --

14              THE COURT:  Well do you want them to stop picking up

15    your material?  Is that what you want?

16              MR. PARKER:  Only if -- well again, without the law

17    being laid down, I want the -- I want the law to be applied

18    equally to everybody on the internet so that I know what the

19    law is, don't violate it in the future and then and do not

20    have a situation where some companies have rules that don't

21    apply to other companies.

22              THE COURT:  Yes.

23              MR. PARKER:  And in fact some circuits have rules --

24    you know.

25              THE COURT:  Yes.

Case 2:15-cv-03304-TON   Document 9   Filed 07/09/15   Page 36 of 69
Case 2:07-cv-02757-MAM   Document 45   Filed 02/05/09   Page 10 of 42
Parker - Argument                                    10

 1              MR. PARKER:  I mean right now if you defame someone

 2    in a search engine, if I bring a Section 230 case in the

 3    Seventh Circuit I have three favorable rulings in my favor.

 4    If I bring it here I have nothing.  I have Green versus AOL.

 5    If I go over to the Seventh Circuit I have two rulings I can

 6    quote that bring the whole Section 230 into question and until

 7    the Supreme Court deals with that, I pretty much pulled off

 8    the internet.

 9              That's what I was saying, I don't know what the

10    controversy is.  I've not threatened them with any lawsuits

11    over the future, anything that they're talking about.  Fair

12    use -- they already have implied license.  So on their side --

13              THE COURT:  Right.

14              MR. PARKER:  -- let's see.  I'd like to know what

15    these claims are against me that separate me from the class of

16    individuals that don't leave their content password protected

17    on the web like the New York Times or like Field -- Field

18    versus Google is quoted, but Field was an attorney who wrote

19    poetry, copyrighted it specifically because he I think wanted

20    to push the envelope, but he wasn't making a living or trying

21    to make a living on the internet as a publisher, which is what

22    I am.

23              What would I settle this for?  I mean, again, I

24    would like -- I do want some damages for the past copyright

25    infringements that I will be -- well, not -- well past now but

Case 2:15-cv-03304-TON   Document 9   Filed 07/09/15   Page 37 of 69
Case 2:07-cv-02757-MAM   Document 45   Filed 02/05/09   Page 11 of 42
Parker - Argument                                          11

1    I mean not -- you know -- for the continued display.  See,

2    once you start a case, the rules pretty much say you have to

3    finish it so if I go in there, I'm not going to pull back and

4    say oops -- you know, the rules just from what I gather don't

5    really -- they frown on that.  You know, don't start something

6    you can't finish so --

7              THE COURT:  The Rules of Civil Procedure you mean?

8    The Court Rules?

9              MR. PARKER:  Well, if I -- if I were to just file a

10   Rule 41 and voluntarily pull this that's considered -- they

11   would prevail.  I mean, and not just in a -- in a minor way

12   but --

13             THE COURT:  Right.  Right, no, no, I --

14             MR. PARKER:  -- because I would have wasted their

15   time and the Court.  I didn't file this with the idea of

16   pulling back -- you know, halfway through so I'm not oriented

17   towards a settlement --

18             THE COURT:  Right.

19             MR. PARKER:  -- unless they're going to offer me

20   something specific.

21             THE COURT:  Okay, all right.  Well --

22             MR. PARKER:  Do you want a dollar amount?  Do you

23   want -- I mean, I --

24             THE COURT:  All right, let me turn to Mr. Mishkin

25   for a moment.

Case 2:15-cv-03304-TON Document 9 Filed 07/09/15 Page 38 of 69
Case 2:07-cv-02757-MAM Document 45 Filed 02/05/09 Page 12 of 42
Mishkin - Argument                    12

1          MR. PARKER:  Okay.

2          THE COURT:  Mr. Mishkin, has Microsoft stopped --

3    not the way I want to say it probably -- picking up Mr.

4    Parker's materials --

5          MR. PARKER:  Can I object?  I guess not.

6          THE COURT:  -- in their search engines?

7          MR. MISHKIN:  Your Honor, the completely mechanical,

8    automatic spidering of the web goes on unless an individual

9    has taken the very well known and easy to implement steps to

10   opt out of that.  I assume by now, Mr. Parker, who claims he

11   didn't want this spidered in the first place, has finally

12   implemented those processes although he didn't before --

13         THE COURT:  Right.

14         MR. MISHKIN:  -- before now and so to be honest,

15   Your Honor, this is a purely automated process.  I don't want

16   to make a misrepresentation to the Court about what that

17   spider is hitting today.  If Mr. Parker has taken the steps to

18   mitigate the -- the problems that he claims were caused by

19   this problem, then absolutely the spidering system will not

20   pick up his material.

21         But, if he continues to decide on his own as is his

22   right to expose his material to all spiders whether MSN's,

23   whether it's Yahoo's, whether it's Google's, then those purely

24   automatic functions will continue and so -- I'm sorry for the

25   long answer, Your Honor --

Case 2:15-cv-03304-TON  Document 9  Filed 07/09/15  Page 39 of 69
Case 2:07-cv-02757-MAM  Document 45  Filed 02/05/09  Page 13 of 42
Parker - Argument                                    13

1          THE COURT:  No, no, that's fine.

2          MR. PARKER:  I know what he's saying.

3          THE COURT:  No, I know what --

4          MR. PARKER:  He's saying --

5          THE COURT:  -- he's saying too, Mr. Parker -- hold

6    on for a second -- let me ask you, sir, have you opted out

7    that mechanical way?

8          MR. PARKER:  I've taken all of my original -- most

9    of my original content off my site.  Let me -- can I just say

10   a couple things?  First off, your ruling on what they're

11   looking to do is equate password protection with copyright

12   protection.  Yesterday I was watching a full length movie

13   that's usually for sale You Tube.

14         I found it on the web.  There was no password

15   protecting.  I can watch a You Tube video without logging into

16   You Tube.

17         THE COURT:  The question, sir, is have you done the

18   technical things --

19         MR. PARKER:  Oh, I'm -- I have --

20         THE COURT:  -- you have to do to opt out of the

21   search engine?

22         MR. PARKER:  -- I have pulled my -- most of my

23   content.  I have articles that I put up and I have a horse

24   racing site that I put up --

25         THE COURT:  Okay.

Case 2:15-cv-03304-TON  Document 9  Filed 07/09/15  Page 40 of 69
Case 2:07-cv-02757-MAM  Document 45  Filed 02/05/09  Page 14 of 42
Parker - Argument                                      14

1          MR. PARKER:  -- I have a chess site sometimes.

2          THE COURT:  Right.

3          MR. PARKER:  As I understand it, your ruling said

4    that implied license could be revoked by the filing of a

5    lawsuit which in that case --

6          THE COURT:  No, I didn't say that.  I said that that

7    was a possibility and I would need further briefing on it.

8    Mr. Parker, I have a factual question to you -- and I'm not

9    saying you should or shouldn't have but I just want to know so

10   I know where we're going --

11         MR. PARKER:  I haven't totally shut down my site,

12   no, I do not --

13         THE COURT:  I didn't ask you about turning down your

14   site --

15         MR. PARKER:  Oh.  I don't use robot stock text

16   because it is too complicated and not -- it's -- I don't know

17   how to implement it.

18         THE COURT:  Okay.  So you have not opted out --

19         MR. PARKER:  No, I have not used the robot --

20         THE COURT:  -- of the search engine --

21         MR. PARKER:  -- the text or --

22         THE COURT:  Okay.

23         MR. PARKER:  Yeah.

24         THE COURT:  All right.  All right.  Mr. Mishkin --

25   but you would like them to stop doing it is what you're

Case 2:15-cv-03304-TON  Document 9  Filed 07/09/15  Page 41 of 69
Case 2:07-cv-02757-MAM  Document 45  Filed 02/05/09  Page 15 of 42
Parker - Argument                                    15

1  telling me?

2          MR. PARKER:  First I would like to know what the law

3  is once it's resolved.  As far as I'm concerned, precedence

4  says an opt out has never been recognized.  Now this Court can

5  obviously carve out an exception for the internet, but if you

6  do that, again, you're equating password protection with

7  copyright protection.

8          That denies my audience the right to just come to my

9  website and read my stuff without giving me their email

10  address which they would have to --

11          THE COURT:  Okay.

12          MR. PARKER:  -- do to get a password.

13          THE COURT:  Okay.  All right --

14          MR. PARKER:  Also, if you --

15          THE COURT:  -- slow down for a second --

16          MR. PARKER:  -- if there are a thousand search

17  engines I'm going to have to opt out with every one of them

18  which takes --

19          THE COURT:  Well my -- I can't -- I mean, I'm not

20  going to be able to solve that problem.

21          MR. PARKER:  Right.

22          THE COURT:  I have a very narrow issue here before

23  me and obviously, you've settled with Mr. Lane before you had

24  a legal ruling --

25          MR. PARKER:  Difference set of facts.

Case 2:15-cv-03304-TON   Document 9   Filed 07/09/15   Page 42 of 69
Case 2:07-cv-02757-MAM   Document 45   Filed 02/05/09   Page 16 of 42
Parker - Argument                                    16

 1            THE COURT:  I'm so sorry?  No, I understand, I

 2   understand.  But all that I'm saying is that on at least those

 3   sets of facts, you didn't want to get a ruling on it so I'm

 4   trying to see if we could think of a way to resolve the

 5   lawsuit, which you're perfectly entitled to do --

 6            MR. PARKER:  Okay.  Can I say --

 7            THE COURT:  -- to resolve it or not.

 8            MR. PARKER:  Actually what happened was we have a

 9   redundant -- we have two attorneys who are basically seeking

10   attorney fees against me for the same thing.

11            If you're at a blackjack table and you can win the

12   same amount of money with a one dollar -- one chip or two

13   chips or you can lose two chips or you can settle with one of

14   the dealers and have one chip at stake for the same thing, it

15   just makes sense in the interest of judicial economy and in

16   limiting my risk on the downside, the longer this trial goes

17   on, the longer it's resolved, I could wind up with their

18   attorney bills which would bankrupt me beyond whatever

19   mitigation --

20            THE COURT:  Right.

21            MR. PARKER:  -- or limits.  I don't know of any

22   constitutional limits.  Now also, I have -- this Court once

23   ordered a psychiatric examination of me for reasons I'm not

24   going to get into but they're a little more complicated than

25   they might appear on the surface, but the point is if I am

Case 2:15-cv-03304-TON   Document 9   Filed 07/09/15   Page 43 of 69
Case 2:07-cv-02757-MAM   Document 45   Filed 02/05/09   Page 17 of 42
Parker - Argument                          17

1    mentally disabled or physically disabled -- I mean, I'm not

2    disabled disabled  but I'm not exactly the young man I used to

3    be.

4            What if somebody with a serious disability in my

5    position puts up a website and gets sued for declaratory

6    relief -- say they have Asperger's, say they have ADHD, say

7    they have ODD, say they have IED -- any of these tons of

8    disorders.

9            I do medical transcription so I hear of a lot.  How

10   would they defend themselves without an attorney?  Where's the

11   equal access?  I mean, where would they get a trial?  I'm not

12   here -- see, this is the first time I've been a defendant in

13   this Court.  I have never been a defendant before so the

14   voluntary aspect of that is gone.  I've been dragged into

15   this.

16           THE COURT:  Right.

17           MR. PARKER:  If the counterclaims are just a device

18   to get me to settle -- the main thing is the law.  You have to

19   -- the main issue that really resolved based on what you said

20   is whether implied license can be revoked by a lawsuit.  If

21   you say that it can't then this case is over on my end because

22   I have no win.  If you say that it can however, then I

23   probably -- you know, then we have something -- you know, a

24   triable issue.

25           I thought that -- when I saw the ruling you

Case 2:15-cv-03304-TON   Document 9   Filed 07/09/15   Page 44 of 69
Case 2:07-cv-02757-MAM   Document 45   Filed 02/05/09   Page 18 of 42
Parker - Argument                                    18

1  basically turned this into a case of my personal copyright

2  after the filing of the lawsuit might give rise to liability.

3  There's nothing here that applies to everybody.

4         But on the other end, this looks like a class

5  action, that they just decided that they'd rather go through

6  me than some big defendant because I don't see the difference

7  between them taking the content off of my site and taking the

8  New York Times' content off of the site, or me taking the New

9  York Times' content, running it through my site in something

10  like the implied license news.

11         Whatever I find on the net just put on my site and

12  then let them come to me.

13         THE COURT:  All right --

14         MR. PARKER:  I could sell --

15         THE COURT:  -- Mr. Parker, I just --

16         MR. PARKER:  -- a lot of advertising in that

17  time --

18         THE COURT:  Okay, all right, I just need to hone in

19  a little bit.  I have a 10:30.  I have a bunch of lawyers --

20         MR. PARKER:  That's okay.  I'm just trying to

21  summarize --

22         THE COURT:  -- troop of lawyers coming in.

23         MR. PARKER:  -- for you as best --

24         THE COURT:  Okay, all right.  So but my question to

25  you is do you want to pursue a resolution?  I could -- I mean

Case 2:15-cv-03304-TON   Document 9 | Filed 07/09/15   Page 45 of 69
Case 2:07-cv-02757-MAM   Document 45   Filed 02/05/09   Page 19 of 42
Mishkin - Argument                                    19

1  we could talk about it today.  I could have you go to a

2  Magistrate Judge who could talk about it with you.

3          Now let me ask you, Mr. Mishkin, would you agree --

4  I mean have you explored this with your client, is this a

5  possibility that you would -- notwithstanding your position

6  that Mr. Parker needs to do the technical thing to stop the

7  search engine from picking up his material -- but would you be

8  willing -- is it technically possible, would you be willing to

9  go in or your client and stop it?

10         You know, do something yourself to stop the search

11  engine picking up any of his material, his websites on the

12  internet, would you be willing to do that and then if in

13  return Mr. Parker drops his claims, to drop your

14  counterclaims?

15         MR. MISHKIN:  Your Honor, I would certainly

16  recommend to my client that if Mr. Parker's desire is for our

17  search engine spider to cease it's automatic search of

18  whatever the websites are that he designates in as part of a

19  resolution of both his claims and Microsoft's counterclaims, I

20  would recommend that to my client, but I confess that I

21  haven't specifically asked that question to my client so I

22  don't want to --

23         THE COURT:  Sure.

24         MR. MISHKIN:  -- make the representation to the

25  Court that I already know the answer.  I don't.

Case 2:15-cv-03304-TON   Document 9   Filed 07/09/15   Page 46 of 69
Case 2:07-cv-02757-MAM   Document 45   Filed 02/05/09   Page 20 of 42
Parker - Argument                                        20

1           THE COURT:   Sure.

2           MR. MISHKIN:   But I would certainly recommend it.

3           THE COURT:   Sure.   So he would recommend that, he

4   can't guarantee it.   So think about it, Mr. Parker.

5           MR. PARKER:   Well, I can tell you my position, it's

6   very clear.

7           THE COURT:   Yes.

8           MR. PARKER:   First off, you've already legitimized

9   opt out copyright with your previous rulings.   If I drop this

10  case that stays in tact with very little likelihood that this

11  issue is going to be pushed by anyone because anyone with the

12  money to push it -- I -- I mean, I -- when you say if I drop

13  the case, I mean -- I -- this case wins in almost every other

14  country other than the US.

15          This case wins in England, this case wins in

16  Belgium, this case wins in Australia --

17          THE COURT:   Sir, I really do -- and I don't want to

18  cut you off but no, but it's entirely up to you, if you don't

19  want to settle it --

20          MR. PARKER:   The ruling is --

21          THE COURT:   -- then you don't have to.

22          MR. PARKER:   Can implied license --

23          THE COURT:   I'm just asking.

24          MR. PARKER:   -- be revoked?   I would have to know

25  that first because that determines whether I even have a case.

Case 2:15-cv-03304-TON   Document 9   Filed 07/09/15   Page 47 of 69
Case 2:07-cv-02757-MAM   Document 45   Filed 02/05/09   Page 21 of 42
Parker - Argument                                           .21

1    THE COURT:  I wouldn't -- I wouldn't decide any

2    other legal issues.  I'm asking you before the Court decides

3    any other legal issues --

4        MR. PARKER:  Absent --

5        THE COURT:  -- do you want to go talk to a

6    Magistrate Judge or -- you know, talk with Mr. Mishkin

7    yourself to try to resolve this?

8        MR. PARKER:  Oh, I have -- I have -- I know exactly

9    what I would want absent a ruling on whether implied license

10   can be revoked because that also impacts me for the future --

11       THE COURT:  Okay.

12       MR. PARKER:  -- but I would need to know that before

13   I could make -- before -- assuming you would be giving me a

14   favorable ruling that would be -- I would -- making that

15   assumption on a favorable ruling on that for any settlement

16   talks so yes, I would be willing to explore it --

17       THE COURT:  Okay, but --

18       MR. PARKER:  -- but only under that premise because

19   I'm not going to assume a loss on that.

20       THE COURT:  Okay, no, but I don't know what you

21   mean.  If you settle the lawsuit it goes away and I make no

22   other decisions.

23       MR. PARKER:  No, I know, but absent your ruling on

24   whether implied license can be revoked, I have to assume that

25   I'm going to get the favorable ruling and if you're asking me

Case 2:15-cv-03304-TON   Document 9   Filed 07/09/15   Page 48 of 69
Case 2:07-cv-02757-MAM   Document 45   Filed 02/05/09   Page 22 of 42
Parker - Argument                                    22

 1   to give up that favorable ruling and what would happen after

 2   that, then that would impact what I would require to settle.

 3            If you make the ruling on the implied license and

 4   whether it can be revoked issue then I know how to proceed.

 5   Absent that, then I have to proceed as if you had made a

 6   favorable ruling and would -- would discuss settlement under

 7   that premise --

 8            THE COURT:  Okay.

 9            MR. PARKER:  -- is what I'm saying.

10            THE COURT:  All right.  I still don't know what you

11   mean.  So what then would be your demand to settle?

12            MR. PARKER:  $39,999 like in a Rule 68 offer --

13            THE COURT:  Okay --

14            MR. PARKER:  -- which would basically be the maximum

15   -- 75 -- if I recovered the maximum statutory damages at

16   trial, based on the ruling that you gave or some other ruling

17   that might affect that, if they would offer me that under Rule

18   68 and I declined it, then the odds of my recovering more than

19   75 percent of that would be next to --

20            THE COURT:  Well -- okay --

21            MR. PARKER:  -- would be very slim and --

22            THE COURT:  Well putting aside a Rule 68 offer

23   judgment --

24            MR. PARKER:  30,000 --

25            THE COURT:  -- which that's not what we're talking.

Parker - Argument                               23

1    How much are you saying?

2           MR. PARKER:   30,000.  One statutory violation of my

3    copyright, the same amount would be what I would want.  Not

4    necessarily an admission of liability but that's what it would

5    take me to abandon the pursuit of the implied license ruling,

6    the trial, and laying down the law.

7           THE COURT:   Okay.  So --

8           MR. PARKER:   I do believe I've had one violation

9    though --

10          THE COURT:   Okay, all right.

11          MR. PARKER:   -- so -- you know --

12          THE COURT:   So the amount is -- I don't know whether

13   you said 30,000 --

14          MR. PARKER:   30,000 would be the amount.

15          THE COURT:   30,000 is your demand.

16          MR. PARKER:   Well, I don't -- I don't know how the

17   process is and again, I tend to -- in chess anyway, it's

18   considered courtesy to let the opponent make the draw for --

19   if you've already offered one or -- or they've explored it,

20   not repeatedly make demands --

21          THE COURT:   Right --

22          MR. PARKER:   -- because you assume that if they were

23   going to offer you --

24          THE COURT:   Right --

25          MR. PARKER:   -- they would step forward.

Case 2:15-cv-03304-TON Document 9 Filed 07/09/15 Page 50 of 69
Case 2:07-cv-02757-MAM Document 45 Filed 02/05/09 Page 24 of 42
Parker - Argument                                              24

1           THE COURT:  No, no, no.  This is your first demand.

2    Mr. Parker hasn't made a demand before this, has he?

3           MR. PARKER:  That's not a demand though.  I'm not

4    demanding it, I'm just saying that I would drop it --

5           THE COURT:  Yes, but that's --

6           MR. PARKER:  -- if that were offered.

7           THE COURT:  -- it's called a demand --

8           MR. PARKER:  Okay.

9           THE COURT:  -- in litigation.  That's all that

10   means.

11          MR. PARKER:  All right.

12          MR. MISHKIN:  Your Honor, the answer is no, Mr.

13   Parker has not previously made a demand.

14          THE COURT:  Okay, all right.  So his demand is

15   $30,000 and them to stop picking up your material --

16          MR. PARKER:  No, actually I wouldn't --

17          THE COURT:  -- or you don't care about that?

18          MR. PARKER:  -- that could -- it would be minor.

19   They've pretty much already done that to some extent but I

20   have more than one website.  I would have to keep reporting to

21   them and then to other search engines.  My right to publish

22   anonymously would be affected.  So, I mean, there are things

23   there.  I -- I --

24          THE COURT:  But can't you do the little robot thing?

25          MR. PARKER:  It's not as simple -- I would like to

Case 2:15-cv-03304-TON   Document 9   Filed 07/09/15   Page 51 of 69
Case 2:07-cv-02757-MAM   Document 45   Filed 02/05/09   Page 25 of 42
Mishkin - Argument                          25

1  have a trial on that issue also to show what -- you know,

2  there's a lot involved in the robots issue.  On my end, if you

3  say that implied license can be revoked we have a five minute

4  trial.  If you say that it can't be revoked we have protracted

5  litigation where then -- then I'm more inclined to say -- you

6  know, I don't have anything to fight for and I don't think you

7  do either --

8          THE COURT:  Okay.

9          MR. PARKER:  -- because I've pretty much

10  preemptively kept my stuff off the web, not just so that it's

11  not archived by them but by anyone --

12          THE COURT:  Right, right.

13          MR. PARKER:  -- you know.  Because I can do this by

14  email and also I can switch to video which is not protected

15  this way.  Like, if I make a video on the camera and then

16  upload it to the net it's not considered internet content in

17  the same -- you know, respect.  So, I'm really looking as much

18  as they are for the law to be laid down.

19          But if they want to settle it and say -- you know,

20  because you've turned this into a case about my personal

21  website -- you haven't -- this doesn't -- this isn't a -- this

22  couldn't be a class action anymore.  If your earlier rulings

23  had been different it might have been.

24          Though as I think as the defendant I feel like it's

25  a class action, that I'm just the only defendant who's

1   representing it.  I might file a motion to that effect or

2   something.

3          THE COURT:  Okay.  All right.  Well, Mr. Mishkin,

4   you've heard what I've heard so why don't you -- you know,

5   consider obviously that demand and then if you want to make a

6   counter offer, obviously you can do that.  And but why don't

7   you try to pursue something and if you get to the point where

8   you think you want to go to a Magistrate Judge, I certainly

9   could obviously arrange that.

10          Did you want to speak, Mr. Mishkin?

11          MR. MISHKIN:  Only to say, Your Honor, that I

12   certainly will convey this demand --

13          THE COURT:  Sure.

14          MR. MISHKIN:  -- to my client as is my obligation.

15   I don't want to -- I don't want to appear unduly optimistic

16   that -- about the outcome.  My suggestion, Your Honor, is that

17   after we explore the possibility of a resolution that the next

18   step be that if a resolution is not possible, a briefing

19   schedule for Rule 56 motions because the legal issues that do

20   remain could well resolve the outstanding issue that Your

21   Honor left open in the course of the Rule 12 forward.

22          THE COURT:  Okay.  All right.  Well let's talk about

23   where we go from here assuming for a moment that there is not

24   a settlement and that you both go forward and, Mr. Mishkin, I

25   know that you have -- well you just said it here in Court but

Case 2:15-cv-03304-TON   Document 9   Filed 07/09/15   Page 53 of 69
Case 2:07-cv-02757-MAM   Document 45   Filed 02/05/09   Page 27 of 42
Mishkin - Argument                                               27

 1    also in your papers, that you would want to do a summary

 2    judgment motion.

 3              MR. MISHKIN:  Correct.

 4              THE COURT:  Without doing any discovery at all?

 5              MR. MISHKIN:  Correct, Your Honor.  We believe these

 6    are issues of law based on the pleadings as Mr. Parker has

 7    presented them to Your Honor that the legal issues can be

 8    resolved without any discovery.

 9              THE COURT:  Okay.  And tell me, have you at this

10    point in your own mind framed what the legal issues are that

11    you would present to me?

12              MR. MISHKIN:  Certainly they would include the

13    volitional issue that Your Honor specifically reserved from

14    the Rule 12 motion, as well as the revocability of the implied

15    license which we believe is a matter of law --

16              THE COURT:  Okay.

17              MR. MISHKIN:  -- and does not require any discovery

18    to resolve.  Moreover, there are Digital Millennium Copyright

19    Act issues that are purely legal issues, and there is the

20    interpretation of the copyright rights that Mr. Parker has and

21    the actions of Mr. Parker's own complaint establish as a

22    judicial fact and therefore are not -- are not in any need of

23    any further discovery that we believe, again, would resolve

24    the remaining issue of the continuing.

25              THE COURT:  So what would happen with your

Case 2:15-cv-03304-TON  Document 9  Filed 07/09/15  Page 54 of 69
Case 2:07-cv-02757-MAM  Document 45  Filed 02/05/09  Page 28 of 42
Parker - Argument                                    28

 1    counterclaims?

 2              MR. MISHKIN:  Well if we were to succeed on the Rule

 3    56 motion with regard to Mr. Parker's claims, we would then be

 4    in a position of making a determination whether to -- if we

 5    can resolve the substantive claims that have been asserted

 6    against Microsoft, Microsoft may decide that it need not

 7    pursue the affirmative relief in the counterclaim, including

 8    seeking attorney's fees although depending on the Court's

 9    ruling of use of copyright and the actions that Mr. Parker has

10    taken may entitle us to relief.

11              But again, in an effort not to have this matter drag

12    on indefinitely, were we to prevail on the remaining

13    affirmative claim against us, in all candor, we would reassess

14    whether it merits further prosecution of our counterclaim.

15              THE COURT:  All right.  What are your thoughts on

16    that, Mr. Parker?

17              MR. PARKER:  If this is on the record, first I want

18    -- you're going to deny it but -- probably -- first I want to

19    request appointed counsel because I am a indigent -- well, in

20    terms of being able to afford counsel, be it disabled or

21    functionally unable to prosecute this case as a regular

22    individual would be and -- what was the third one?

23              Oh, yes, a defendant meaning that I'm not here

24    voluntarily.  So I'm just saying that without counsel I

25    believe I'm already being prejudiced, I'm --

 1          THE COURT:  Yes.

 2          MR. PARKER:  On the -- I might file a motion or

 3   something, just to preserve my rights or --

 4          THE COURT:  Sure.

 5          MR. PARKER:  -- because again, I'm concerned more

 6   for the individual who really hasn't worked in law offices or

 7   might be a little more disoriented or -- or more unable to do

 8   this than me, because I'm certainly not the most incapable

 9   person on the planet but I have limitations that -- I'm being

10   sued by Microsoft so if there's ever a case where that --

11          THE COURT:  Well, you sued Microsoft and I have the

12   feeling that if your suit weren't here, they would probably do

13   what was just hinted at my Mr. Mishkin so I think that's

14   what --

15          MR. PARKER:  Well --

16          THE COURT:  -- would happen.  But go ahead.

17          MR. PARKER:  -- theoretically the one case --

18          THE COURT:  Tell me your thoughts.

19          MR. PARKER:  -- oh, that's the other thing, I may

20   want -- I suppose separating these cases because one case you

21   have which is actually very simple which is my claim -- their

22   claims, if they're going to raise DMCA (phonetic) because this

23   is active fair use issues which go beyond even my case, now

24   you're talking about financial discovery, records discovery,

25   corporate discovery, testimony of their officers regarding

Case 2:15-cv-03304-TON  Document 9  Filed 07/09/15  Page 56 of 69
Case 2:07-cv-02757-MAM  Document 45  Filed 02/05/09  Page 30 of 42
Parker - Argument                                    30

1  their motive, why they created a search engine, why I'm

2  supposed to believe that a publically traded company whose

3  mission under the very rules of the SEC are to look after the

4  shareholders first, act like they're doing this for something

5  other than money.

6          What is this higher purpose that a publically traded

7  company has?  Where is it in their 10Q filings or their 12 --

8  whatever those filings are?  That's if they're coming -- see,

9  again, you have two cases.  You have my suit over my

10  copyright, their search engine.  I'm the one creating the

11  content.

12          People go on the -- you know, people watch TV to

13  read TV Guide or they read TV Guide to find out what's on TV

14  because they're basically TV Guide.  I'm the TV.  I'm the one

15  making the content that the audience comes to watch.  They're

16  the ones that are putting them in touch with me.  It's as if

17  TV Guide is making all the money off of TV with these engines.

18          I mean, this is not a small amount of money.  Yes,

19  there are ways around it.  I can find them and as long -- you

20  know, that's why also I would rather the law be laid down so

21  that everybody has equality.  But, when you're talking the

22  counterclaims, I have to defend myself.

23          THE COURT:  Right.

24          MR. PARKER:  The rules for discovery on a defendant

25  are much different than on a plaintiff --

Case 2:15-cv-03304-TON   Document 9   Filed 07/09/15   Page 57 of 69
Case 2:07-cv-02757-MAM   Document 45   Filed 02/05/09   Page 31 of 42
Parker - Argument                                          31

1          THE COURT:  Okay.  All right.

2          MR. PARKER:  -- so I need to -- if they're going to

3     come out and say we don't make a -- oh, and they claimed I

4     didn't make a profit from my books?  I have plenty of checks

5     ordered them (sic).  I -- I have plenty of revenue that it's

6     well documented for years from these books.

7          THE COURT:  Okay.

8          MR. PARKER:  I copyrighted them before the search

9     engines even really took advertising.  I've been on the net

10    since 1996 or '94.

11         This is not -- you know, I didn't just arrive here

12    and say ooh -- you know, I've been building a specific

13    business and one of the reasons I've been delayed is the lack

14    of legal -- you know, with the defamation I had to pull back

15    and say okay, I can't fight that with this.

16         I may have to pull back and say I'm just going to

17    have to be -- the only copy I want in their search engine are

18    my advertising copy, my spam, so my website's just going to

19    have nothing but marketing materials.  Copy that all you want.

20    So I don't even worry about the spider.

21         They did infringe my registered works or what would

22    have been infringement.  Is it an abuse of copyright to defend

23    my -- to defend my copyright under a opt out policy that's

24    never been validated?  I don't see what I'm abusing here.  I

25    didn't register these works with this lawsuit in mind, I

Case 2:15-cv-03304-TON   Document 9   Filed 07/09/15   Page 58 of 69
Case 2:07-cv-02757-MAM   Document 45   Filed 02/05/09   Page 32 of 42
Parker - Argument                           32

 1    registered them because I know on the internet people can

 2    steal your work very easily.  So to me, that registration is a

 3    universal opt out.

 4            And again, I raised a WTO issue in my answer.  I

 5    wasn't going to look to other countries if our Courts are

 6    protecting and saying our American search engines who own 95

 7    percent of this market have the total implied license to copy

 8    works from Belgium, France, England.

 9            You know, WTO says you can't pass laws in a country

10    that favor one country over another.  The wrong rulings or

11    laws in this country can lead, as they did in offshore

12    gambling to something like Antigua getting a claim against us.

13            THE COURT:  Okay --

14            MR. PARKER:  If this country's entering into these

15    agreements and these treaties, I would assume that these

16    treaties are relevant to any case in the country.  So when you

17    talk about the counterclaims, you're talking about this really

18    -- I'm going to fight it because I want -- I don't want them

19    to get these declaratory releases.

20            THE COURT:  Okay --

21            MR. PARKER:  This affects me in the -- you know, in

22    the -- my claim --

23            THE COURT:  Okay --

24            MR. PARKER:  -- is just a matter of what you

25    said --

1          THE COURT:  Okay --

2          MR. PARKER:  -- though, one ruling.

3          THE COURT:  Okay, all right.  All right, well then,

4    Mr. Mishkin, I think what we'll do is we'll set a schedule for

5    that motion and so we won't do discovery before but, Mr.

6    Parker, when you respond to it, and as you say, you know, you

7    do have some experience in law because your responses have

8    been -- you know, have been sometimes very much on point for a

9    non-lawyer.  Very much so.

10         But what we'll do is you can then respond to it and

11   if you feel that somehow in responding you need discovery of

12   something, then you can ask for it.  Do you know what I'm

13   saying, sir?  Does that make sense?

14         MR. PARKER:  If they say we don't profit from -- if

15   they assume facts not in evidence --

16         THE COURT:  Right.

17         MR. PARKER:  -- which they almost have to to get

18   these rulings, I don't see how this motion can be brought

19   without discovery.

20         THE COURT:  Okay.  And I have no view of it because

21   I mean, I hear what Mr. Mishkin has just said but this is the

22   first time I'm hearing what he's going to do so I don't have

23   any view of whether he's going to be successful or not or

24   whether discovery is needed.

25         But I think in view of everything I've heard this

Case 2:15-cv-03304-TON   Document 9   Filed 07/09/15   Page 60 of 69
Case 2:07-cv-02757-MAM   Document 45   Filed 02/05/09   Page 34 of 42
Colloquy                                                    34

1    morning, I will allow him to go forward, file his motion --

2    which of course as you know, Mr. Mishkin, you can always file

3    it anyway but often summary judgment motions, people don't do

4    it unless the Court says we're ready to do it so you can do

5    that but then, Mr. Parker-- and obviously I'll give you -- you

6    know, a reasonable amount of time --

7              MR. PARKER:  Can I --

8              THE COURT:  -- to respond.  Do you have a feeling as

9    to how much time you might want?  Maybe you need to see it

10   first I think.  Let's --

11             MR. PARKER:  Well, to respond, what I would say is

12   that -- you know, again, without discovery, we can look ahead.

13   They're going to say -- for DMCA they have to prove they don't

14   profit.  How can they -- I'm getting no discovery on that

15   issue?  Because if I prove that, I've knocked out every DMCA

16   claim of theirs.

17             THE COURT:  Yes, well we'll see.  I don't know what

18   they're going to say so when they say whatever it is they're

19   going to say, look it over, drop me a note letting me know how

20   much time you need to respond and I'm sure we won't have a

21   problem with that.  And then after Mr. Parker responds, Mr.

22   Mishkin, you can do a reply.

23             MR. PARKER:  I --

24             THE COURT:  I will look at it.  Now, if in your

25   opposition, Mr. Parker, you have said some of those issues

Colloquy                                                          35

1    need discovery so I need discovery on them to respond, I'll

2    evaluate that and perhaps schedule another oral argument here

3    in Court or whatever, but then we'll see where we go from

4    there.   And obviously if I deny the motion -- and I have no

5    view of it -- then we'll have to get together again and talk

6    about where we go from here.

7              MR. PARKER:  So no discovery then until -- you're

8    not opening discovery --

9              THE COURT:  Not at this point -- yes, not at this

10   point until we see whether or not Mr. Mishkin is presenting to

11   me certain issues you don't need discovery for.  But you'll

12   have the opportunity to tell me that you think you do need

13   discovery, once you see what he's saying.  But I think you

14   need to see what he's saying first.

15             MR. PARKER:  Well wouldn't you just have to assume

16   all facts in my favor?

17             THE COURT:  Yes.  Well, I mean --

18             MR. PARKER:  So again --

19             THE COURT:  -- I had to give you all --

20             MR. PARKER:  All benefits of the doubt --

21             THE COURT:  Yes --

22             MR. PARKER:  -- unless they can prove it through

23   some kind of affidavit but then I can counter.

24             THE COURT:  I don't know what he intends to do but

25   he referred to your complaint -- Mr. Mishkin did, I shouldn't

Colloquy                                    36

1    say he -- Mr. Mishkin will no doubt take some facts from your

2    complaint it sounds like and then he may or may not give me an

3    affidavit.  I don't know what he intends to do on that.  But

4    if the affidavit presents factual issues that you need

5    discovery on, then I will hear from you and if I decide that

6    that's true, that you need to do discovery on facts that are

7    relevant, then I will make that decision.

8              I take it you're intending to make several arguments

9    that you don't to win on all of them --

10             MR. MISHKIN:  That's correct, Your Honor.

11             THE COURT:  -- I assume is what you're saying.

12             MR. MISHKIN:  Exactly.

13             THE COURT:  So, it may be that I decide he loses on

14   all of them or he wins on one.  If I think he wins on one,

15   then I'm not going to -- I won't do the others probably, most

16   likely.  So, there may be some that I think it's fair for you

17   to get discovery on, you need it, on others it may not be.  So

18   let's see.

19             MR. MISHKIN:  And it might be moot depending on the

20   nature of the motion.

21             THE COURT:  Exactly, yes.  So let's see what he has

22   to say.  Now when can you file it, Mr. Mishkin?  What are your

23   thoughts?

24             MR. MISHKIN:  Your Honor, I was thinking 30 days

25   would be adequate for me.

 1            THE COURT:  Okay, 30 days from today.  I'll do an

 2    order after this but let me see -- we're at January -- what

 3    are we, January 27th?

 4            MR. MISHKIN:  27th, Your Honor.

 5            THE COURT:  So we're talking say February 27th,

 6    okay?

 7            MR. MISHKIN:  That would be fine.  Thank you, Your

 8    Honor.

 9            THE COURT:  February 27th, and then within a week of

10    getting that, Mr. Parker, you need to tell me how much time

11    you need, okay?

12            MR. MISHKIN:  Well I usually -- what's the normal

13    limit?  20 days?

14            THE COURT:  It's usually 14 days --

15            MR. MISHKIN:  But if I need discovery is that -- or

16    should I --

17            THE COURT:  No, but you need to file something to

18    tell me you need discovery so you're going to need to file

19    something --

20            MR. PARKER:  A motion for expedited discovery is it?

21            THE COURT:  No, no, I would not -- no, I'm not going

22    to grant any discovery until Mr. Mishkin files his motion and

23    you oppose it, telling me what discovery you need and why you

24    need it, okay?

25            MR. PARKER:  Yes, Your Honor.

1          THE COURT:  And I'll try to lay that out in my order

2    as well that states February 27th.  So on February 27th or

3    thereabouts, you will get his motion.  You need to read it,

4    tell me how much time you need to respond.  Don't -- you don't

5    need to respond to it, just tell me within a week, Judge, I

6    need 30 days, I need 45 days, 60 days -- whatever it is, okay?

7          MR. PARKER:  I -- I -- what's -- the normal is 20

8    days, right?

9          THE COURT:  I guess it's 14 but whatever you need,

10   Mr. Parker --

11         MR. PARKER:  14?

12         THE COURT:  Yes, but I'll give you whatever you

13   need, Mr. Parker.

14         MR. PARKER:  For summary judgment motion?  It's not

15   20?

16         THE COURT:  No, 20 is to answer a complaint.  But it

17   doesn't matter what it is.

18         MR. PARKER:  Okay.

19         THE COURT:  I'll give you what you need, whatever

20   amount of time you need.

21         MR. PARKER:  Well, you know, I tried to meet the

22   time limits so far so --

23         THE COURT:  No, but that not -- it's truly not

24   necessary --

25         MR. PARKER:  -- whatever --

Case 2:15-cv-03304-TON   Document 9   Filed 07/09/15   Page 65 of 69
Case 2:07-cv-02757-MAM   Document 45   Filed 02/05/09   Page 39 of 42
Colloquy                                          39

1        THE COURT:  -- I mean, if I'm going to give you as

2   much time as you need.

3        MR. PARKER:  Well then we put a briefing schedule

4   together.  30 would be standard -- I would think I could --

5   unless discovery was required, in which case it would be

6   longer.

7        THE COURT:  No, but even if you think discovery is

8   required, within 30 days, all you need to do is respond and

9   tell me.  You can say, Judge, on issue (a), I can't respond to

10  that now because I need discovery of these three points.

11       MR. PARKER:  How about --

12       THE COURT:  I need to do a, b, c, and that -- and

13  when I get that information, that's going to be relevant to

14  the legal argument -- are you with me?

15       MR. PARKER:  Well, they demanded a jury trial,

16  didn't they?

17       THE COURT:  I don't recall at this point.

18       MR. PARKER:  I believe you did on your counterclaim.

19       MR. MISHKIN:  Your Honor, that has no bearing on the

20  summary judgment motion.

21       THE COURT:  I have it here --

22       MR. PARKER:  Well -- isn't --

23       THE COURT:  -- maybe I can look at it?

24       MR. PARKER:  -- isn't whether or not they profit

25  from their search engine a finding of fact for a jury, not a

1   Judge?

2              THE COURT:  Sir, I don't even -- I'm not even going

3   to respond to that because I -- it's hard to do it --

4              MR. PARKER:  Put it in a motion.

5              THE COURT:  -- you have to know things --

6              MR. PARKER:  Put it in a motion -- okay.

7              THE COURT:  -- in context.  Well no, not -- you

8   don't have to put it in a motion.

9              MR. PARKER:  I mean in the response.

10             THE COURT:  Let's find out what they're going to

11  say.  We don't know what they're going to say yet.

12             MR. PARKER:  Okay.

13             THE COURT:  So unless I know what people are going

14  to say, I don't like to give advisory opinions.  But let me

15  just look --

16             MR. MISHKIN:  And, Your Honor --

17             THE COURT:  -- you asked me a certain question.

18             MR. MISHKIN:  -- and I've just looked at our

19  counterclaim.

20             THE COURT:  Yes.

21             MR. MISHKIN:  We did not demand a jury.

22             THE COURT:  Yes, okay.  They had not is the answer.

23             MR. PARKER:  Oh, Yahoo did I think maybe then.

24  Okay.  So there's no --

25             THE COURT:  Okay.

1           MR. PARKER:  Can I -- wait -- can I withdraw my jury

2       demand?

3               THE COURT:  Sure.

4               MR. PARKER:  Okay, no jury trial?

5               THE COURT:  Sure.

6               MR. PARKER:  That allows you to be the fact finder.

7               MR. MISHKIN:  Yes, Microsoft would agree with that,

8       Your Honor.

9               THE COURT:  Okay, all right --

10              MR. PARKER:  So you -- you're the fact finder now.

11              THE COURT:  So there's no -- okay, all right.  So

12      then --

13              MR. PARKER:  No voir dire if it gets to the trial.

14              THE COURT:  Okay, all right, all right.  So if we

15      don't -- if I don't grant summary judgment, then we'll talk

16      about discovery and a bench trial, okay?

17              MR. PARKER:  Uh-huh.

18              THE COURT:  Okay, all right, everybody, thank you so

19      much for coming in.  I appreciate it and I will issue an order

20      along the lines of what I just said.  Okay, everybody, thank

21      you very much.  We're adjourned.

22                  (Proceedings concluded at 10:04 a.m.)

23                              * * *

24

25

Case 2:15-cv-03304-TON   Document 9   Filed 07/09/15   Page 68 of 69
Case 2:07-cv-02757-MAM   Document 45   Filed 02/05/09   Page 42 of 42

42

# C E R T I F I C A T I O N

I, Diane Gallagher, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

**Diane Gallagher**

Digitally signed by Diane Gallagher
DN: CN = Diane Gallagher, C = US
Date: 2009.02.04 12:56:53 -05'00'

February 1, 2009

DIANE GALLAGHER

DIANA DOMAN TRANSCRIBING

## IN THE UNITED STATES COURT
## FOR THE EASTERN DISTRICT OF PENNSYVLANIA

| | | |
|---|---|---|
| **GORDON ROY PARKER,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **JACQUELINE FAYE GOLDHAGEN,** | : | **Case No:  15-cv-3304-TON** |
| | : | |
| **Defendant** | : | |
| | : | |

### CERTIFICATE OF SERVICE

I, Gordon Roy Parker, Plaintiff in the above-styled action, hereby certify that I have served

a copy, by **hand delivery**, to Defendants' counsel of record, of the following:

    1.   Plaintiff's Response to Defendants' Rule 11 Motion

Gary Green, Esq.
Sidkoff, Pincus & Green
1100 Market, 27th Floor
Philadelphia, PA  19107-3601

This the 9th day of July, 2015.

Gordon Roy Parker, Pro Se
4247 Locust Street, #119
Philadelphia, PA 19104
(267) 298-1257
SnodgrassPublish@aol.com
**PLAINTIFF**