## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GORDON ROY PARKER,** | : |
| a/k/a "Ray Gordon" | : |
| **Plaintiff** | : |
| **v.** | : |
| | : |
| **JACQUELINE FAY GOLDHAGEN** | : |
| a/k/a Jacqui Holland | : |
| **Defendant** | : |

CIVIL ACTION NO. 15-3304

## <u>ORDER</u>

AND NOW, this _____ day of _____, 2015, upon consideration of

Defendant Jacqui Holland's Motion to Dismiss, it is hereby ORDERED that the Defendant's

Motion is GRANTED. Plaintiff Gordon Roy Parker's Complaint is DISMISSED with prejudice.


_____
                                                        J.

## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GORDON ROY PARKER,** | : | **CIVIL ACTION NO. 15-3304** |
| a/k/a "Ray Gordon" | : | |
| **Plaintiff** | : | |
| v. | : | |
| | : | |
| **JACQUELINE FAY GOLDHAGEN** | : | |
| a/k/a Jacqui Holland | : | |
| **Defendant** | : | |

### DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT

Pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6), Defendant Jacqui Holland

("Defendant"), by her undersigned counsel, respectfully moves the Court for an Order dismissing

the Amended Complaint on the grounds that this Court has no personal jurisdiction over

Defendant under the Constitution or under any other statute or rule of law, including the

Pennsylvania Long-Arm Statute, 42 Pa. C.S.A. § 5332; and that the Amended Complaint fails to

state a claim upon which relief can be granted.

Pursuant to Local Rule 7.1, accompanying this Motion is a Brief and a proposed Order.

In support of the Motion, Defendant relies on the following, as well as the accompanying Brief

and Defendant's (still pending) Motion under Rule 11 for Sanctions, which is incorporated by

reference.

1.      Plaintiff originally filed a long, rambling, almost incomprehensible, pro se

Complaint; and during the time Defendant's counsel was in the midst of finalizing a Motion to

Dismiss, Plaintiff, without prompting, filed an Amended Complaint which required Defendant's

counsel to have to rewrite the Motion to Dismiss.

2.      While Plaintiff condensed his verbiage in the Amended Complaint, Plaintiff did

nothing to cure the defects that permeated the original version, and like the original, the

Amended Complaint is a hodge-podge of legal sounding gibberish that despite its verbosity, fails on the one hand to establish a basis for personal jurisdiction over Defendant (Rule 12(b) (2)), and on the other, fails to state a claim upon which relief can be granted (Rule 12(b)(6)).

3.      Defendant disputes the accuracy, truthfulness and aptness of whatever Plaintiff intended to plead (if anything) for purposes of establishing personal jurisdiction or venue in this District Court. Simply stated, as made clear in our subsequent discussion, there is no legal or Constitutional basis to allow this Court to exercise personal jurisdiction over Defendant, a California resident who engaged in no activity in, or touching, Pennsylvania, sufficient to allow jurisdiction over her.

4.      With regard to the Rule 12(b)(6) aspect of this Motion, although Defendant does not admit the facts pled in the Amended Complaint, for purposes of this Motion, and without waiving her right to object or otherwise dispute, or defend against what Plaintiff has alleged, Defendant has attempted below to decipher from the Amended Complaint the pertinent facts Plaintiff attempted to assert.

**Summary of the Pertinent Facts**

5.      The Amended Complaint alleged that Defendant is "domiciled and residing in Los Angeles, California. Amend. Compl. at ¶ 2.

6.      According to Plaintiff's perception of Defendant: "She is a rising-star actress known for cutting edge, and extremely sexy PG-13 work".  Amend. Compl. at ¶ 2.

7.      The Amended Complaint alleged further that Defendant is a "hypnotist/life coach with a practice" in Los Angeles, California.[1]

---

[1] In other words, the Amended Complaint admits that Defendant lives and conducts her hypnotherapy practice in California. There are no allegations that Defendant came into Pennsylvania, or otherwise took any action in, or was connected to Pennsylvania; and the Amended Complaint itself therefore establishes there is no personal jurisdiction over Defendant. Plaintiff disingenuously attempts to overcome what he surely recognized from his many pro se

8.      The Amended Complaint alleged Plaintiff first discovered the existence of Defendant when he stumbled on a YouTube video of Defendant entitled "New Age Hypnotist" where Defendant showed her skills in performing "hypnosis on a client". Amend. Compl. at ¶ 8.

9.      Plaintiff fancies himself an expert at playing chess, and claims to be training several hours per day. Amend. Compl. at ¶ 9.

10.     Plaintiff stated at ¶ 9 of the Amended Complaint he was "impressed with Defendant's talent (she was a professional stage hypnotist for three years and is a trained actress), [and] explored the possibility of hiring her as his personal hypnotist, **for the express purpose of aiding his chess training**." (Emphasis added).[2]

---

cases was a lack of personal jurisdiction by concocting a mindless theory based on no legal precedent or even logic at ¶¶21-23 that because Defendant sent an email to Plaintiff "threatening legal action if Plaintiff did not remove all of his postings concerning Defendant and her practice, including the Yelp review," according to Plaintiff's erroneous, amateur legal reasoning, he was authorized to sue Defendant in Philadelphia. Of course, Plaintiff does not bother to plead in either the original Complaint or the Amended Complaint any facts that would support personal jurisdiction even though he was expressly instructed in the Orders issued under Rule 12(b)(2) dismissing his earlier pro se cases, where in similar circumstances, the Courts ruled Plaintiff had no right to drag into Pennsylvania (or Delaware) a party like Defendant, who had committed no acts, and who had no legally sufficient ties to the locus of the forum. (*See Parker v. Learn the Skills Corp.,* 219 Fed.Appx. 187 (3d Cir. 2007); *Parker v. Sloan et al,* Civ. A. No. 08-cv-829 (E.D. Pa. 2008); *Parker v. Learn the Skills Corp., et al.,* Case No. 06-cv-00229 (D. Del. 2006); *Parker v. Learn the Skill Corp. et al.,* 2006 WL 759693, *4 (E.D. Pa. 2006)).

[2] As shall be developed, Plaintiff wrote in a web-based submission a description of what he wanted Defendant to create for him, and it was to be a video in which Defendant would use hypnotherapy techniques "for the express purpose of aiding his chess training". Amend. Compl. at ¶ 9. Plaintiff thus admits he communicated to Defendant he wanted to buy a "chess training video" and did not ask if Defendant was willing to make any kind of fetish video. Amend. Compl. at ¶ 12. In reading the Amended Complaint, it becomes clear that if Plaintiff is to be believed at all, it appears he secretly had lurid fetish longings in his head when thinking about what he hoped would be on the video, but those lurid thoughts were not communicated to Defendant. *Id.* Rather, Defendant took Plaintiff at his word and assumed Plaintiff wanted what he ordered. Therefore, in response to Plaintiff's request for using hypnosis as an aide to chess game training, Defendant, in anticipating her hypnotherapy plan, asked Plaintiff:

> I need to ask you a few questions. Are you audio, visual or kinesthetic? [Note: Defendant was inquiring if Plaintiff learned best by hearing, seeing or doing – *See* https://en.wikipedia.org/wiki/Kinesthetic_learning]
> I don't know that much about chess. Can you tell me when you win how you feel? Also, some positive things that happen during the game… (*See* box at Amend. Compl. ¶ 16)

11.      Plaintiff alleged he searched the web for ways to make contact with Defendant, and discovered she had been registered with a website known as "Custom Club". Amend. Compl. at ¶10.

12.      On Custom Club, Plaintiff found an advertisement that had nothing to do with Defendant's current hypnotherapy services, but rather was related solely to her long-since abandoned efforts to sell video clips of a mature nature. Amend. Compl. at ¶¶ 10, 16).[3]

13.      As the text box in ¶ 16 of the Amended Complaint established, the Custom Club advertisement was posted long online before Defendant became a hypnotherapist, and at the time of the ad's posting, Defendant had not become a hypnotherapist. Therefore, even if Defendant had not abandoned the Custom Club, the services from Defendant offered through it did not include hypnosis.

14.      Nonetheless, Plaintiff alleged he used the Custom Club web site to try to pay Defendant a thousand dollars to make a custom hypnosis video for him to use in his chess game training; but the Amended Complaint further alleged that because Plaintiff had trouble with the web site, he never did "click the payment link" provided by the Custom Club web site. Therefore, no payment was ever transmitted from Plaintiff to Defendant by the Custom Club web site. Amend. Compl. at ¶¶ 12, 15.

15.      Defendant did not accept Plaintiff's proposal to pay for the chess-hypnosis video through the Custom Club website (because Plaintiff was no longer affiliated with it. *See*

---

[3] At ¶ 16 of the Amended Complaint, Plaintiff admits that when he contacted Defendant through the Custom Club website, she immediately responded and told him by email that she had long since stopped any affiliation with Custom Club, and on numerous times, had tried to erase all of its references to her, but was unable to do so. Defendant said, as is quoted at ¶17:

> I hate that site [Custom Club] [I]t's really confusing I tried to erase it on numerous occasions but could not figure out how to do that either.

Amend. Compl. at ¶16, and instead, Defendant suggested that Plaintiff could pay through PayPal. Amend. Compl. at ¶16-17.

16.     This was not acceptable to Plaintiff who claimed in the Amended Complaint he would pay through the Custom Club web site, or he would not go through with the purchase. Thus Plaintiff states at ¶17 that he rejected Defendant's suggestion to pay her through PayPal, and that "<u>Plaintiff fired Defendant</u>," thus aborting any agreement. (Emphasis added).

17.     The Amended Complaint establishes therefore that there was never a meeting of the minds; Plaintiff never paid any money to Defendant; and Plaintiff rescinded his offer saying in the Amended Complaint at ¶ 17, "Plaintiff no longer trusted Defendant to hypnotize him".[4]

18.     Although Plaintiff never was a customer of Defendant, had not purchased any hypnosis video from Defendant, and claims at ¶ 18 that he had instructed Defendant to "never contact him again," the Amended Complaint at ¶ 20 nonetheless admits that after he cancelled his request for the chess training video, Plaintiff "*decided to begin speaking out about his experience with Defendant*". By "speaking out" Plaintiff means that he falsely implied  he was a customer of Defendant's hypnosis services, and with that false credential, posting scathing, negative reviews of Defendant on popular consumer review web sites such as Yelp.com and

---

[4] Plaintiff dissembles about his inexplicable and strange behavior by gratuitously describing what he claims were his supposed motives for acting oddly. But when he does this, Plaintiff cannot keep his stories straight. For example, Plaintiff admits and describes in the Amended Complaint his express request to buy from Defendant a hypnotherapy video for chess training—something that would be respectable even to a prude. But Plaintiff needs to explain why he was insistent on paying for the video <u>only</u> through the adult, Custom Club web site, and why he did not accept Defendant's reasonable alternative of PayPal after Defendant advised Plaintiff she was no longer affiliated with the Custom Club web site and explained to Plaintiff that she had for years, been trying to erase her name from it.

Plaintiff's explanation of why he cancelled the transaction defies credulity, and is completely implausible. He alleged that he rejected Defendant's suggestion because "PayPal prohibits 'adult transactions, thus putting Plaintiff's PayPal account (and even his regular bank account) at risk under Operation Chokepoint". *See* Amend. Compl. at ¶17.  However, the transaction to buy the chess training video was expressly <u>not</u> an "adult transaction".  Similarly, everything else stated in ¶ 17 is embarrassingly, and transparently the false rationalizations of a person who must think he is telling his story to imbeciles.

RipoffReport.com. Besides being misleading, the reviews Plaintiff posted falsely and

maliciously referred to Defendant as a "fetish hypnotist". Amend. Compl. at ¶¶ 20-21.[5]

19.       On June 7, 2015, Defendant sent an email to Plaintiff demanding that Plaintiff

remove the flawed and misleading reviews, and whatever other misleading postings Plaintiff had

put on the Internet about her.  Compl. at ¶¶ 21-23.[6]

_____

[5] The sum total of Plaintiff's experience with Defendant was he ordered a chess related hypnotherapy video from Defendant, a certified hypnotherapist, whom Plaintiff first saw on a YouTube video entitled "New Age Hypnotist" where she was administering services to hypnotherapy clients. Amend. Compl. at ¶ 8. It was Plaintiff who then became obsessed with Defendant, and created in his mind, a warped, lascivious opinion of Defendant that motivated him to track her down. How delighted Plaintiff must have been when he found the abandoned, and inoperative advertisement for Defendant on adult web site, Custom Club that Plaintiff had *formerly* been associated with. Yet as the Amended Complaint reveals, Plaintiff well knew that Defendant was not in the business of providing fetish videos involving hypnotism, and therefore, he did not request from Defendant anything remotely related to such a fetish video. Instead, he focused on Defendant's current occupation as a plain, mainstream, hypnotherapist and requested a totally non-sexual hypnosis video for chess training.

Despite the falsehoods Plaintiff plastered throughout his Yelp.com review (see next footnote), Defendant never was, nor has she ever held herself out to be a "fetish hypnotist". On the contrary, in the YouTube video Plaintiff saw of Defendant, she was wearing business attire, and was working with clients who had life-related problems concerning self-esteem, wanting to stop smoking, and other areas where hypnotherapy has shown positive results; and none of the YouTube sessions had any kind of sexual content (except when viewed by the likes of Plaintiff who obviously did not need much to stimulate his lustful yearnings). Plaintiff never saw a single video of Defendant performing any kind of fetish hypnosis. Sadly, as evinced by the Amended Complaint, Plaintiff read into the abandoned ad from Custom Club much more than was reasonable, and allowed his lustful fantasies to replace reality. Perhaps this is suit and Plaintiff's fantastic departure from reality is all the result of delusions Plaintiff may be suffering due to his admitted bi-polar disorder (as plead in Plaintiff's 2015 lawsuit against the Social Security Administration where he described his bi-polar mental illness). *See* SSI Complaint at ¶ 28 in Exhibit "A".

As discussed at length in Defendant's Rule 11 Motion for Sanctions, the reason why none of Plaintiff's allegations about his own actions, and his thin rationalizations make any sense in the context of the lawsuit  is his real purpose is to stalk and force a relationship with Defendant whom he sees as a beautiful actress he currently is using as a trophy he bagged in Internet postings Plaintiff makes for what he thinks are his "fans" online, where he has repeatedly boasted of suing a beautiful actress, as if Defendant had agreed to date him.

[6] In the Yelp.com review, attached as Exhibit "A" to the Complaint, Plaintiff pretended to be a person with first-hand knowledge about Defendant's services as a hypnotherapist. For example, he used her first name in the review to falsely imply he has had a personal relationship with Defendant, and discussed things he fabricated or surmised as if he knew them from experience.

Defendant had recently, in 2015, finished training as a hypnotherapist, and was in the process of building a practice. The Yelp.com review was therefore particularly damaging because Plaintiff accused Defendant of being a dangerous, fetish hypnotist who would injure her clients. Since Plaintiff had never been a customer of Defendant, and most of what he wrote sprung wholly from his warped imagination and lust for Defendant that the reader would not have reason to recognize, Plaintiff's Yelp.com review snuffed out Defendant's causing it to be stillborn.  What is infuriating is that Plaintiff never met Defendant, was never hypnotized by Defendant, and Plaintiff knows nothing about Defendant except what he read in articles where Defendant was of interest because she is a movie star. Moreover, Plaintiff spouted shamelessly and maliciously, phony statistics and supposed facts he just made up out of whole cloth. Worse, Plaintiff did not admit to the readers of the Yelp.com review what he admitted in the Complaint

20.  Plaintiff would not relent, and since the postings by Plaintiff were causing Defendant

to lose business from her hypnotherapy business, Defendant posted a rebuttal on

---

he filed in his case he filed in July of 2015 in this District against the Social Security Administration (as mentioned above) that he has been collecting Social Security Disability Income due to having a bi-polar disorder. *SSI* Complaint at ¶ 28 in Exhibit "A". Plaintiff thus hid from the readers of the Yelp.com review that by being bi-polar to the point of being disabled for purposes of Social Security, he probably fit the pattern common for sufferers of bi-polar disorder who are known in the medical literature to suffer from long lasting hallucinations, and to have delusions of grandeur where they act as if they had credentials they actually lack. This is critical because in the Yelp.com review,  Plaintiff posed as an expert on hypnosis, when in fact his relationship with hypnosis appears to be limited to his erotic fantasies and fixation on people like Defendant, who when they discover the truth about who and what Plaintiff is, react as Defendant has, and want nothing to do with him.

In the Yelp.com review, Plaintiff maliciously maligned Defendant falsely and disparaged her hypnotherapy business for the improper reasons described in the pending Rule 11 Motion for Sanctions.  Some of the statements in the Yelp.com review that were false and disparaging included the following, all of which are quoted from Plaintiff's posting on Yelp.com and reprinted in the Complaint's Exhibit "A":

- Hypnosis is a known sexual fetish, which is why attractive female hypnotists can write their own ticket. Jacquie has provable ties to the hypnofetish community.

- Jacqui has also said she has performed at "grad nights." There are MINORS at those shows. Would anyone want a male hypnofetishist hypnotizing their underaged daughters? It's not that Jacqui herself is a problem per se, but the hypnosis she performs triggers fetishes in 4-6 percent of the population, more at a show.

- Any woman intelligent enough to hypnotize people on stage is more than intelligent enough to know she's turning on almost every male who falls under her spell. Beauty itself is hypnotic, and adds to the trance, even if the ostensible purpose is therapeutic.

- After finding a very powerful induction (and very sexy, replete with phone-sex voice and dominant overtones), from Jacqui on YouTube, I tried to see if she had any videos for sale on the clips site.

- It is there that I found this highly trained SAG actress (all of which make for vastly superior hypnotists)…

- I immediately declined the transaction, and was no longer comfortable dealing with Jacqui, who put me in a bad position since now she is useless to me as a hypnotist, as I didn't trust what she had done, and other hypnotists are useless because they lack her extreme level of talent and training.

- Someone who claims to understand artists didn't do a good job in my case, and I would rather have never seen her hypnosis at all than to be bait-and-switched in what I consider such a dishonest manner.

- Would I recommend letting her inside your head? Never. I've been doing hypnosis since I was eight. Hypnotists like Jacqui are great if they like you or want something, and can be a psyche-injuring nightmare otherwise. She crossed into a seriously controversial gray area when she put up that fetish video page as well. A male hypnotherapist with a similar duality would be met with skepticism at best.

RipoffReport.com that said, in part, "The man who wrote this review is an internet troll." Defendant linked her rebuttal to a web site that chronicled Plaintiff's many years of cyberstalking and bullying young women:  https://encyclopediadramatica.se/Ray Gordon. Defendant also tried to undo the gratuitous damage Plaintiff caused to Defendant's hypnotherapy practice by saying in her rebuttal:  "I am not a fettish [sic] hypnotist."

**<u>Summary of the Reasons Why Each of Plaintiff's Counts Fail as a Matter of Law</u>[7]**

21.     **The Court lacks personal jurisdiction over Defendant (Rule 12(b)(2)).**

a.     Plaintiff has failed to plead any facts that would allow the Court to exercise personal jurisdiction.

b.     On the contrary, the case pled by Plaintiff affirmatively and conclusively establish that there is no Constitutional or other legal basis for the exercise of personal jurisdiction.

22.     Plaintiff's case fails under Rule 12(b)(6) as each claim in each Count is not "plausible on its face". *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

23.     The Complaint has five Counts: Count I is for Declaratory Relief; Count II is for Breach of Contract; Count III is for Fraudulent Misrepresentation; and Counts IV and V are for Defamation. Each Count in the Complaint fails as a matter of law, as described further below and in the attached Memorandum of Law.

24.     <u>Count One seeking Declaratory Relief</u> fails to state a claim upon which relief can be granted, and is unsupported by any competent allegations.

---

[7] This part of the Motion is in the form of an executive summary that organizes the facts into legal issues, and provides an on-the-spot discussion of certain legal issues when compelled by the facts alleged in the Amended Complaint. The Memorandum of Law discusses the legal issues with argument and in greater depth.

a.   Plaintiff asks the Court for a broad declaration affirming that "nothing he has written until the time of its ruling gives rise to a cause of action against him, by her, for defamation." Amend. Compl. at ¶ 37. However, Plaintiff has alleged no claim for Declaratory Relief because the Amended Complaint has failed to describe any justiciable issue for the Court to decide.

b.   Plaintiff improperly asks the Court to issue a declaration of rights and wrongs based on what the Amended Complaint describes as a mere threat of litigation in an email from Defendant that demanded that Plaintiff take down misleading and derogatory comments about Defendant on consumer web sites; but what Plaintiff' actually wrote was not disclosed in the Amended Complaint, and therefore, Plaintiff asks the Court to issue a Declaratory Order about matters that are not before the Court, are not pled, and are unknown.

c.   The reason the Court cannot ascertain from the Amended Complaint what the subject of its Declaratory Order might be is because the Amended Complaint failed to quote or describe what Plaintiff had written on the consumer web sites that provoked the email from Defendant demanding that Plaintiff remove the inappropriate comments about Defendant. Rather, the Amended Complaint alleged nothing about the content of Plaintiff's own writings, and therefore, the Court can't ascertain what Plaintiff posted on the consumer review web sites that provoked Plaintiff's email.

d.   The mere threat of litigation in an email is not sufficient to create any issue the Court could decide or even "declare". There is no allegation that the threat is of an imminent nature, which state or court system would be the host for the litigation, and therefore, the Court has no clue what state's law would be applied if any case was ever filed.  Moreover, the Amended Complaint does not even mention what allegations would be made if a case was even

filed, or what relief would be sought.  The whole topic of what the supposed threat of litigation included is a complete mystery; and it could hardly justify the instant case filed by Plaintiff.

  e. No declaratory relief is appropriate since the litigation itself, if a case were ever filed, would resolve the liability of Plaintiff for his actions, and he therefore does not need, and provided no basis for the Court to grant, declaratory relief.

  f. Plaintiff is asking the Court for an advisory opinion about a mythical law suit.

  g. As discussed, in rendering the advisory opinion that Plaintiff seeks, the Court would not have personal jurisdiction over Plaintiff.

  h. Likewise, Plaintiff failed to satisfy the legal standard for declaratory relief which required Plaintiff to plead allegations showing that his "right to relief is clear; that declaratory relief is necessary to avoid an injury that cannot be compensated by damages; and that greater injury will result from refusing rather than granting the relief requested." *Boring v. Google Inc.*, 362 F. App'x 273, 282 (3d Cir. 2010).

  i. Plaintiff's mere speculation about a future lawsuit based on an email from Plaintiff (and not even from an attorney) that made a demand that Plaintiff take down defamatory Internet postings is not enough to satisfy the requirements for declaratory relief or to establish personal jurisdiction over Defendant.

  25. <u>Count Two, purporting to allege Breach of Contract</u> fails to state a claim upon which relief can be granted, and is unsupported by any competent allegations, as established by the summary of the facts alleged in the Amended Complaint, set forth below:

   a. Plaintiff has alleged no meeting of the minds sufficient to even form a contract. Plaintiff alleged only that he saw Defendant in a YouTube video performing hypnotherapy on a client, wanted Defendant to make a custom video to help Plaintiff in his

chess-game training, but no contract was reached before Plaintiff rescinded his offer and refused to pay. *In re Barnes Foundation*, 661 A.2d 889, 895 (Pa. Super 1995) (There must be allegations that are "sufficiently specific so as to enable [a] defendant to prepare [her] defense.")

      b.    It was Defendant who, for no legal cause, rescinded his offer when Plaintiff advised him that she no longer was affiliated with the Custom Club, had been trying for years to sever all ties with it, and therefore Custom Club's payment apparatus could not be used. Moreover, the identity of the entity that would process the payment (i.e., Custom Club or PayPal), was never made a condition of the bargain, and was not mentioned or agreed to by Defendant. *See Lombardo v. Gasparini,* 385 Pa. 388, 393, (1956); *Biddle v. Johnsonbaugh*, 444 Pa. Super. 450 (1995) (Both parties to a contract must manifest an intent to be bound by sufficiently definite terms).

      c.    Plaintiff represented to Defendant he wanted to order a custom video that he admits in the Amended Complaint was to be used to help Plaintiff in his chess-playing; and Plaintiff did not state in his order he wanted a fetish video, or anything other than a regular hypnotherapy video for his chess playing. According to the allegations in the Amended Complaint, Plaintiff's uncommunicated hope for a fetish video was never communicated to Defendant.

      d.    When Defendant would not accept payment via the Custom Club website, Plaintiff (as alleged in the Amended Complaint) "fired" Defendant at a time when Defendant was willing to provide the video, if Plaintiff wanted it, but he did not; and the transaction was cancelled by Plaintiff; and Plaintiff paid no consideration. *See Eighth North–Val, Inc. v. William L. Parkinson DDS P.C. Pension Trust,* 2001 Pa. Super. 101, 107 (2001) (Defining consideration under Pennsylvania law).

e.     If Plaintiff sincerely thought that the transaction depended on his being able to pay for it solely through the Custom Club web site, this was not a duty imposed by any agreement that Plaintiff had with Defendant, and there never was a meeting of the minds on the method of payment. Therefore, no contract was formed. *See Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir 20013) (Breach of contract requires existence of a contract; breach of a duty imposed by the contract; and resultant damages).

f.     At best there was a mutual mistake where Plaintiff thought Defendant was still affiliated with the Custom Club web site, and he refused to do business with her when he found out she was not.

g.     No money changed hands, the mistake was evident, and cured instantly, and there was never an offer or counter offer that was accepted.  All that is presented is Plaintiff's unfounded conclusions. *See Evancho v. Fisher*, 423 F. 3d 347, 351 (3d Cir. 2005) (Bald assertions or legal conclusions in a complaint are insufficient to defeat a Motion to Dismiss).

h.     The Amended Complaint states no damages or loss cognizable under any law.  *See Ferrer v. TRs. Of the Univ. of Pa.*, 825 A.2d 591, 610 (Pa. 2010); *CoreStates Bank, N.A. v. Cutillo,* 723 A.2d 1053, 11058 (Pa. Super. 1999); *Ware*, *supra*.

26.     <u>Count Three, purporting to allege Fraudulent Misrepresentation</u> fails to state a claim upon which relief can be granted, and is unsupported by any competent allegations, as established by the summary of the facts alleged in the Amended Complaint, set forth below.

a.     Plaintiff admits that he did not expressly request that Defendant make him a *fetish* video, but instead, the Amended complaint alleges that Plaintiff expressly asked for a **hypnosis video to improve his chess game**.

12

b.     Plaintiff bases his claim for fraudulent misrepresentation on the allegation that earlier in her career, Defendant had signed up with Customs Club which offered adult videos, but Defendant severed her relationship with Custom Club (long before Plaintiff had contacted her), and the listing of her name on the Customs Club web site, as Defendant explained to Plaintiff, was a mistake.

c.     The Amended Complaint admits Plaintiff had not requested a fetish video in his order on Custom Club, but instead asked for a chess training hypnosis video.

d.     The Amended Complaint admits also that Defendant never offered to make a fetish video for Plaintiff.  If Plaintiff expected to get a fetish video, it was a wish that was not communicated to Defendant who took Plaintiff at his word that he was ordering a chess training video.

e.     Since the issue of a fetish-hypnosis video, according to the Amended Complaint, was never mentioned by Plaintiff as what he wanted, and since a fetish-hypnosis video was not described, mentioned or offered by Defendant, there can be no claim of fraudulent misrepresentation.

f.     When Defendant declined to accept payment through her outdated and link on the Custom Club web site, and suggested that Plaintiff use PayPal to pay for a legitimate hypnotherapy video dealing with chess-game-improvement, there was no misrepresentation whatsoever since Plaintiff had not offered to buy a fetish video, and Defendant had not offered to sell one.

g.     The Amended Complaint fails to state the words, or context of the alleged statement by Defendant that Plaintiff contends he relied on and was false.

13

h.      The copy of the ad on Custom Club quoted in the Amended Complaint does not mention "hypnosis," since when that ad was first placed, Defendant had not yet learned hypnosis, nor had she become a certified hypnotherapist; and there is nothing on the ad that could reasonably read as a representation by Defendant that she was offering a fetish video involving hypnosis.

i.       The Amended Complaint does not allege Defendant said anything about a fetish-hypnosis video; Plaintiff never asked Defendant for a fetish-hypnosis video, and Defendant neither consented nor refused to make a fetish video since the topic was never raised by Defendant or Plaintiff.

j.      The misrepresentation Count in the Amended Complaint is nonsensical, and fails to state a claim for which relief can be granted.

27.      <u>Counts Four and Five, purporting to allege Defamation</u> fail to state a claim upon which relief can be granted, and is unsupported by any competent allegations, as established by the summary of the facts alleged in the Amended Complaint, set forth below.

a.      Plaintiff has alleged no valid claim for Defamation, and instead, seeks to base his defamation case on Defendant's link to an Internet page.[8]

b.      In a pro se case that Plaintiff filed against Google, as well as in other cases he brought against different parties, Plaintiff was advised in court Orders dismissing his claims that the law does not impose liability defamation liability for linking to a web page that might be

---

[8] The Amended Complaint claims that in a rebuttal she posted to the negative reviews Plaintiff gave Defendant on a consumer review website, Defendant linked to a page about Plaintiff on the Encyclopedia Dramatica web site (https://encyclopediadramatica.se/Ray_Gordon) *See* Amend. Compl. at ¶ 28). The defamation claims are based solely on Defendant's link and no defamatory statements by Defendant.

defamatory if it had been authored by others.  *See Parker v. Google, Inc.*, 422 F. Supp. 2d 492,

504 (E.D. Pa. 2006) *aff'd*, 242 F. App'x 833 (3d Cir. 2007).

        c.      While the Encyclopedia Dramatica webpage does discuss Plaintiff's

sordid reputation and gives many details and links to evidence showing Plaintiff's history as a

known cyberbully and cyber stalker, nothing on the Encyclopedia Dramatica webpage had been

written by Defendant (who did not know of Plaintiff when the material on the site was published

on the web).[9]

        d.      As noted, from having had his prior pro se complaints dismissed by a

variety of judges in this District, Plaintiff is well aware that his defamation claims in this case are

barred by Section 230 of the Communications Decency Act of 1996, 47 U.S.C. § 230 ("Section

230"); and in fact, the Amended Complaint itself references Section 230 which provides (and the

case law so holds) that links (such as Defendant's link here) to any website she did not author

could not legally be the subject of any action for defamation. *See Barrett v. Rosenthal*, 40 Cal. 33

(2006) (ruling that user of interactive computer services was immune from defamation liability

for posting information passed to her by a third-party publisher); *Zeran v. America Online, Inc.*,

129 F.3d 327, 331–33 (4th Cir. 1997) ("Subjecting Internet service providers and users to

defamation liability [for third-party published content] would tend to chill online speech.").[10]

---

[9] The Amended Complaint alleges Plaintiff sought to have the Encyclopedia Dramatica page deleted many years before Defendant found Plaintiff on the Internet. *See* Amend. Compl. at ¶ 29; and therefore the Amended Complaint established that Plaintiff knew before he filed the Amended Complaint that Defendant was not the "originator" of the content of the Encyclopedia Dramatica content. Thus the Amended Complaint itself establishes Defendant's immunity under Section 230.

[10] One of Plaintiff's cases had opinions by both the District Court and the Third Circuit, so Plaintiff certainly has reason to comprehend in advance that his defamation claims were unsound, and were frivolous. Indeed, one of Plaintiff's own cases was dismissed by the District Court and the dismissal was affirmed because there was no liability under Section 230 for referencing content on linked web sites. *See Parker v. Google, Inc.*, 422 F. Supp. 2d 492, 504 (E.D. Pa. 2006) *aff'd*, 242 F. App'x 833 (3d Cir. 2007).

28.     As demonstrated, there is no personal jurisdiction over Defendant; and likewise, Defendant has failed to allege any viable cause of action.

29.     Because of the admissions in the Amended Complaint, this is not a case where Plaintiff should be given still a third or fourth chance to amend his complaint. He had the Rule 11 Motion in his hand and it prompted him to file the Amended Complaint since in it, Defendant asserted many of the issues for dismissal that are discussed again in this Motion.

30.     While the Court should respect pro se litigants and not allow their inexperience to thwart valid claims, Plaintiff here claims to have been a paralegal and a legal secretary; and he has more experience filing his numerous pro se cases over what appears to be throughout a 15 year (plus) period in this District, in Federal Court in Delaware, and in the Court of Common Pleas. He has attended conferences with judges, and has filed pro se appeals to the Third Circuit. Therefore, while not a lawyer, Plaintiff has been to the rodeo before.

31.     The Court must also respect the costs and harassment that Defendant has had to endure at the hands of Plaintiff, as well as the expense. She is not a company, but rather a hard working individual who is attempting to regroup from being an actress to a new occupation of hypnotherapist. Plaintiff has already reduced the prospects of that new business by his antics on the Internet.  At the same time, he crushed her start-up business, and he has required Defendant to finance a defense against his frivolous and misbegotten action in this Court. There is nothing Plaintiff could add in a new pleading that would rescue his case, and his Amended Complaint should be dismissed with prejudice.

WHEREFORE, Holland respectfully requests that this Court enter an Order dismissing Plaintiff's Complaint with prejudice.

Respectfully submitted,

_____
Gary Green, Esquire
Attorney I.D. PA 15730
**SIDKOFF, PINCUS & GREEN, P.C.**
2700 Aramark Tower
1101 Market Street
Philadelphia, PA  19107
(215) 574-0600
Dated:  July 20, 2015                          (215) 574-0310 (fax)

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GORDON ROY PARKER,** | : | **CIVIL ACTION NO. 15-3304** |
| a/k/a "Ray Gordon" | : | |
| **Plaintiff** | : | |
| **v.** | : | |
| | : | |
| **JACQUELINE FAY GOLDHAGEN** | : | |
| a/k/a Jacqui Holland | : | |
| **Defendant** | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

**PAGE**

Table of Authorities ............................................................................................ ii

I.  Background ................................................................................................1

II.  Legal Argument .........................................................................................3

    A.  Plaintiff's Complaint Should Be Dismissed for Lack of
        Personal Jurisdiction ........................................................................3

        **1.**  Discussion of the law of minimum contacts
              for personal jurisdiction .......................................................3

        **2.**  The circumstances of this case do not allow
              for personal jurisdiction .......................................................5

    B.  Plaintiff's Complaint Should Be Dismissed for Failure to State
        A Claim upon Which Relief Can Be Granted......................................7

        1.  Standard for the plausibility test .................................................7

        2.  Plaintiff is not entitled to Declaratory Relief.............................8

        3.  The Amended Complaint demonstrates there was no contract...............11

        4.  Plaintiff pleads no facts demonstrating Fraudulent
           Misrepresentation by Defendant ...........................................13

        5.  Plaintiff Pleads No Facts Demonstrating that Defendant
           Defamed Him By Linking to a Third-Party Website ............................14

III.  Conclusion ...............................................................................................17

i

# TABLE OF AUTHORITIES

**Case**                                                                                      **Page**

*Accu-Weather, Inc. v. Prospect Commc'ns, Inc.*
  644 A.2d 1251 (1994) ........................................................................................11

*Ackourey v. Sonellas Custom Tailors*
  573 F. App'x 208 (3d Cir. 2014)........................................................................4, 5

*Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*
  139 F. 3d 419 (4th Cir.1998) ...............................................................................8

*Ashcroft v. Iqbal*
  556 U.S. 662 (2009).............................................................................................7

*Barrett v. Rosenthal*
  40 Cal. 4th 33.....................................................................................................15

*Bennett v. Itochu Int'l, Inc.*
  682 F. Supp. 2d 469 (E.D. Pa. 2010) .................................................................13

*Boring v. Google Inc.*
  362 F. App'x 273 (3d Cir. 2010)....................................................................10, 11

*Byars v. Sch. Dist. of Philadelphia*
  942 F. Supp. 2d 552 (E.D. Pa. 2013) ...................................................................7

*Decker v. Dyson*
  165 Fed. Appx. 951 (3d Cir. 2006)....................................................................4, 6

*Dow Jones & Co. v. Harrods, Ltd.*
  237 F. Supp. 2d 394 (S.D.N.Y. 2002) .............................................................9, 10

*EBC, Inc. v. Clark Bldg. Sys., Inc.*
  618 F.3d 253 (3d Cir. 2010)...............................................................................14

*Evers v. Dwyer*
  358 U.S. 202 (1958) .............................................................................................8

*In Re Joey's Steakhouse, LLC*
  474 B.R. 167 (Bankr. E.D. Pa. 2012) ................................................................11

*In Re Schering Plough Corp. Intron*
  678 F.3d 235 (3d Cir. 2012).................................................................................8

*Int'l Shoe Co. v. Washington*
  326 U.S. 310 (1945)................................................................................................7

*King v. Burwell*
  2015 WL 2473448 (2015).....................................................................................12

*Mitan v. A. Neumann & Associates, LLC*
  2010 WL 4782771 (D. N.J. Nov. 17, 2010) .......................................................16

*Morse v. Lower Merion Sch. Dist.*
  132 F.3d 902 (3d Cir.1997)....................................................................................7

*Novins v. Cannon*
  2010 WL 1688695 (D. N.J. Apr. 27, 2010) ........................................................16

*Parker v. Google, Inc.*
  422 F. Supp. 2d 492 (E.D. Pa. 2006) *aff'd*, 242 F. App'x 833 (3d Cir. 2007) .........15

*Parker v. John Doe a/k/a "Wintermute"*
  Civil Action No. 02-7215 .......................................................................................2

*Parker v. Kelly Services, Inc. and Independence Blue Cross*
  2:15-cv-03337 (E.D. Pa. 2015) ..............................................................................2

*Parker v. Learn Skills Corp.*
  530 F. Supp. 2d 661 (D. Del. 2008)....................................................................2, 6

*Parker v. Learn the Skills Corp.*
  2004 WL 2384993 (E.D. Pa. 2004) ........................................................................2

*Parker v. Learn the Skills Corp.*
  2006 WL 759693 (E.D. Pa. Mar. 23, 2006).............................................................6

*Parker v. Social Security Administration, et al.*
  15-3453 (E.D. Pa. 2015) .....................................................................................2, 9

*Parker v. Trustees of the University of Pennsylvania*
  No. CIV.A. 05-4874, 2008 WL 60190 (E.D. Pa. 2008) .........................................2

*Parker v. Univ. of Pennsylvania*
  No. 02-CV-567, 2004 WL 2004099 (E.D. Pa. 2004)
  aff'd, 128 F. App'x 944 (3d Cir. 2005)....................................................................2

*Parker v. Viacom Int'l, Inc.*
  605 F. Supp. 2d 659 (E.D. Pa. 2009) ..................................................................2, 6

iii

*Parker v. Yahoo!*
  2008 WL 4410095 (E.D. Pa. 2008) ...................................................................2

*Ricci v. Teamsters Union Local 456*
  781 F.3d 25 (2d Cir. 2015)...........................................................................16

*Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor Control Bd.*
  559 Pa. 56, 739 A.2d 133 (1999)..................................................................11

*Time Share Vacation Club v. Atl. Resorts, Ltd.*
  735 F.2d 61 (3d Cir. 1984).............................................................................3

*Vives v. Rodriguez*
  849 F. Supp. 2d 507 (E.D. Pa. 2012) ...........................................................11

*Wilton v. Seven Falls Co.*
  515 U.S. 277 (1995)......................................................................................10

*World-wide Volkswagen Corp. v. Woodson*
  444 U.S. 286 (1980)....................................................................................4, 6

*Zeran v. America Online, Inc.*
  129 F.3d 327 (4th Cir. 1997) ........................................................................15

*Zippo Mfg. Co. v. Zippo Dot Com, Inc.*
  952 F.Supp. 1119 (W.D. Pa. 1997)................................................................4

## STATUTES AND RULES

42 Pa. C.S.A. § 5301 ...........................................................................................4

42 Pa. C.S.A. § 5301(a)(1) (2005) ......................................................................4

42 Pa. C.S.A. § 5322 ...........................................................................................4

42 Pa. C.S.A. § 5322(b) ......................................................................................3

42 Pa. C.S.A. § 5332...........................................................................................1

Fed.R.Civ.P. 4(e) ................................................................................................3

Fed.R.Civ.P. 8(a) ..............................................................................................13

iv

Fed. R. Civ. P. 9(b) ...................................................................................................13

Fed. R. Civ. P. 12(b)(2)...............................................................................................1

Fed. R. Civ. P. 12(b)(6)............................................................................................1, 7

28 U.S.C. §2201 ..........................................................................................................8

47 U.S.C. § 230................................................................................................. *passim*

## MEMORANDUM OF LAW

Defendant Jacqui Holland ("Defendant") submits this Brief in support of her Motion to Dismiss the Complaint for lack of personal jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(2) and for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiff Gordon Roy Parker's ("Plaintiff") allegations regarding Holland are patently false, but even taking them as true for purposes of this Motion, Plaintiff's suit must be dismissed with prejudice as Plaintiff's detailed description of the facts in the Amended Complaint fails to establish even a single viable cause of action. Moreover, and most prominently, this Court lacks personal jurisdiction because Holland has no contacts in Pennsylvania as required by the Constitution and Federal Rules of Civil Procedure.

I.    **Background**

The facts have been covered in great detail in the Motion part of this submission, and in this section, certain of the facts will be summarized only when they are needed for context.

On June 12, 2015, Plaintiff filed this lawsuit *pro se*, and after Plaintiff was served with Defendant's Motion under Rule 11 for Sanctions, Plaintiff filed the Amended Complaint that this Motion to Dismiss addresses.  We begin by noting that in the pending Rule 11 Motion, we examined why Plaintiff's case was not filed for any legitimate purpose, and established how Plaintiff has severely deviated from what is required to satisfy Rule 11. But during the past fifteen years, Plaintiff has demonstrated a habit of not needing causes of action, or facts showing his chosen forum has personal jurisdiction before filing his pro se lawsuits. In fact, the judges of this District know Plaintiff as a serial litigator who files many cases; from the available record,

1

all of them seem to have been dismissed both in this Court, and in the other courts where Plaintiff has filed his numerous pro se cases.[11]

Holland is a hypnotist who has, for at least the past ten years, lived in Los Angeles, California. Amend. Compl. at ¶ 2. This most recent suit alleges claims for declaratory relief, breach of contract, fraudulent misrepresentation, and defamation against Defendant. These allegations revolve around a supposed transaction on June 4, 2015, where Plaintiff sought to purchase a custom-made hypnosis video to improve his eyesight and chess skills. Amend. Compl. at ¶ 12. Plaintiff claims that Holland breached a contract she created with Plaintiff by asking him to pay her through PayPal, rather than a third-party site (Customs Club) with which she was no longer affiliated. Amend. Compl. at ¶¶ 15-16.

Plaintiff admits that following this "supposed" breach of contract, he decided to "speak out about his experience with Defendant" and post online reviews of Defendant. Amend. Compl. at ¶ 29. The manner in which Plaintiff elected to "speak out" was to post false and defamatory reviews on Internet consumer review sites. In a short rebuttal to one of Plaintiff's malicious reviews of Defendant's hypnotherapy services, on a consumer website, Defendant posted a link to a webpage on a website called Encyclopaediadramatica.com (what Plaintiff refers to as the "ED" page), which provides a detailed history of Plaintiff and some of his prior lawsuits that had

---

[11] Plaintiff has filed 14 lawsuits since 2002, including this case: *See Parker v. Social Security Administration, et al.*, 15-3453 (E.D. Pa. 2015); *see also Parker v. Kelly Services, Inc. and Independence Blue Cross*, 15- 3337 (E.D. Pa. 2015); *Parker v. Viacom Int'l, Inc.*, 605 F. Supp. 2d 659 (E.D. Pa. 2009); *Parker v. Yahoo!*, 2008 WL 4410095 (E.D. Pa. 2008); *Parker v. Learn Skills Corp.*, 530 F. Supp. 2d 661 (D. Del. 2008); *Parker v. Learn the Skills Corp.*, 2004 WL 2384993, at *2 n. 4 (E.D. Pa. 2004); *Parker v. Google, Inc.*, 422 F. Supp. 2d 492, 504 (E.D. Pa. 2006) *aff'd*, 242 F. App'x 833 (3d Cir. 2007); *Parker v. John Doe a/k/a "Wintermute"*, Civil Action No. 02-7215; *Parker v. Univ. of Pennsylvania*, No. 02-CV-567, 2004 WL 2004099, at *1 (E.D. Pa. 2004) aff'd, 128 F. App'x 944 (3d Cir. 2005); *Parker v. Trustees of the University of Pennsylvania* No. CIV.A. 05-4874, 2008 WL 60190, at *1 (E.D. Pa. 2008). *See also, Parker v. Learn the Skill Corp.*, 2006 WL 759693, *4 (E.D. Pa. March 23, 2006) ("Further, we are persuaded that it would be inappropriate to allow this serial litigant plaintiff 'to conduct a fishing expedition to construct a basis for jurisdiction.'")

been thrown out of court, Plaintiff's sordid reputation as an Internet troll including his stalking and his bullying of women, and other allegations that paint Plaintiff as either a liar or delusional. Amend. Compl. at ¶ 28.  In Counts IV and V, Plaintiff alleges claims of defamation against him by Holland for linking to the "ED" page on a public website. Amend. Compl. at ¶¶ 28 and 57. Plaintiff also alleges that Defendant has made defamatory statements concerning Plaintiff "beyond the internet, to those in her regular life." Amend. Compl. at ¶ 62. In total, Defendant seeks $336,000 for the defamation claims.

We have summarized the Amended Complaint's other, vaguer allegations in the Motion, and will not repeat the summary here since they were more in the nature of babbling than pleading and made no sense from a legal analysis standpoint. However, we will discuss the elements of each cause of action named in the Counts of the Amended Complaint to show why none of them amount to anything that could survive dismissal.

## II.   Legal Argument

### A.   Plaintiff's Complaint Should be Dismissed for Lack of Personal Jurisdiction

#### 1.   Discussion of the law of minimum contacts for personal jurisdiction

Fed. R. Civ. P. 4(e) permits a district court to assert personal jurisdiction over a nonresident only to the extent allowed under state law where the district court sits. *See Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 63 (3d Cir. 1984). The Pennsylvania Long Arm Statute, 42 Pa. C.S.A § 5322(b), allows a court to exercise jurisdiction over a person "to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." *Id.* Accordingly, a court may not exercise personal jurisdiction over a non-

resident defendant unless there "exist minimum contacts between the defendant and the forum state." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291 (1980).

Under Pennsylvania law, personal jurisdiction can be obtained either through general jurisdiction, 42 Pa. C.S.A. § 5301, or specific jurisdiction, 42 Pa. C.S.A. § 5322. General jurisdiction arises over a party if the person's domicile or presence was in the state at the time of the service of process or there was consent to suit. *Decker v. Dyson*, 165 Fed. Appx. 951, 953 (3d Cir. 2006); 42 Pa. C.S.A. § 5301(a)(1) (2005). Under the U.S. Constitution, "[s]pecific jurisdiction is invoked when the cause of action arises from the defendant's forum related activities such that the defendant should reasonably anticipate being haled into court there." *Id.*

In the context of Internet communications and agreements, ascertaining specific personal jurisdiction in claims arising from Internet commerce "requires courts to determine whether a defendant established minimum contacts through cyberspace." *Zippo Mfg. Co. v. Zippo Dot Com, Inc.,* 952 F.Supp. 1119, 1123, 1124 (W.D. Pa. 1997). When analyzing Internet commerce cases, courts should see if "the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." *Id.* at 1124.

The Third Circuit has held that this sliding scale ranges from situations "where a defendant uses an interactive commercial website to actively transact business with residents of the forum state (personal jurisdiction exists)" to situation where "a passive website merely provides information that is accessible to users in a forum state (personal jurisdiction does not exist)." *Ackourey v. Sonellas Custom Tailors*, 573 F. App'x 208, 211-12 (3d Cir. 2014). As we discuss, in this case, Defendant had nothing that resembled an "interactive commercial website," and in fact, all of the communications for the deal were constructed by Plaintiff after he saw a

4

YouTube video featuring Defendant, and then found a way to communicate with Defendant on the Custom Club website that Defendant had abandoned prior Plaintiff's Internet-based discussion of an offer.

### 2.   The circumstances of this case do not allow for personal jurisdiction

Plaintiff asserts that personal jurisdiction is appropriate over Defendant in Pennsylvania because of "diversity jurisdiction and the amount in controversy." Amend. Compl. at ¶ 4. Personal jurisdiction cannot be conferred based on any allegations in the Amended Complaint.

The controversy is built entirely on a potential commercial transaction that never occurred because Plaintiff alleges he "fired Defendant." Amend. Compl. at ¶ 17. Plaintiff was going to purchase a video from an adult content website that sold custom-made videos with which Defendant is no longer associated. Compl. at ¶ 12. Plaintiff then voluntarily terminated his purchase order when Defendant asked that he pay through PayPal rather than through the third-party unaffiliated website. Compl. at ¶ 17.  The only other contact pled in the Amended Complaint is in the form of Defendant's posting of a rebuttal to Plaintiff's derogatory consumer review of her hypnosis services, and an email Defendant sent demanding that Plaintiff remove the false consumer reviews he had maliciously posted about Plaintiff. None of this, taken at full face value, comes close to meeting the tests for a court to exercise personal jurisdiction.

Here, Defendant did not have an "interactive commercial website to actively transact business with residents of the forum state." *Ackourey*, 573 App'x at 211.  Instead, Plaintiff was surfing the Internet and happened to stumble upon a non-commercial video on YouTube where Defendant was providing hypnotherapy services to a client.  Plaintiff then searched for a way to contact Defendant, and through Google or another search engine, found the old, outdated Custom Club link to Defendant. However, when Plaintiff found that link, Defendant had no extant

affiliation with the Custom Club site, and could not transact business on it. Instead, Defendant asked Plaintiff to pay through PayPal. Moreover, it was Plaintiff who had the idea for a video in the first place since Defendant had not done anything like that since she had become a hypnotherapist. Instead, Defendant performs her services for clients on a live, in-person session—in California, where she lives and her business is located.  Similarly, Defendant does not offer canned hypnosis videos that had been made in advance, nor does Defendant regularly solicit customers to make special, hypnosis videos at their request.  In this case, Plaintiff was the sole driving force, and the originator of the idea for the chess-training hypnosis video. Plaintiff likewise was the one who set the price of $1,000 for the chess training hypnosis video—and he did this without any inquiry or input from Defendant of what she would want to charge. Furthermore, Plaintiff was not responding to any advertisement from Defendant to make a hypnosis video (because that was not how her business operated). Given the facts established by the Amended Complaint, no sufficient contacts can be established under Plaintiff's theory. *See World-Wide Volkswagen,* 444 U.S. at 291.

Notably, Plaintiff is not a novice at litigation or being dismissed for deficiency jurisdiction. *See Parker v. Learn Skills Corp.*, 530 F. Supp. 2d 661 (D. Del. 2008); *see also Parker v. Learn the Skills Corp.*, 2006 WL 759693 (E.D. Pa. Mar. 23, 2006); *Parker v. Viacom Int'l, Inc.*, 605 F. Supp. 2d 659 (E.D. Pa. 2009). Plaintiff was not only on notice that this Court has no jurisdiction over Defendant, but because of his prior experiences before this Court he should have been well-versed on its necessity.

In determining specific personal jurisdiction, jurisdictional analysis requires that plaintiff's cause of action is related to or arises out of the defendant's contacts in the forum. *Decker v. Dyson,* 165 Fed. Appx. at 953. The Third Circuit reiterated that plaintiff must establish

6

that the defendant has had "minimum contacts" with the forum state and that the exercise of jurisdiction would comport with "traditional notions of fair play and substantial justice. *Id.* (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Forcing Holland to litigate in Pennsylvania would be contrary to "traditional notions of fair play and substantial justice" as she has never made even minimum contacts here, nor has she **ever** performed a contract with Plaintiff.

    **B.**    **Plaintiff's Complaint Should Be Dismissed for Failure to State A Claim upon Which Relief Can Be Granted**

        **1.**  **Standards for the plausibility test**

Federal Rule of Civil Procedure 12(b)(6) allows the Court to dismiss a complaint for failure to state a claim upon which relief can be granted. To survive a motion to dismiss, the complaint must contain "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 570 (2007)) (quotations omitted). The court may dismiss a complaint or claim "if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Byars v. Sch. Dist. of Philadelphia*, 942 F. Supp. 2d 552, 561 (E.D. Pa. 2013) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73). The Court need not, however, accept any conclusions of law, unsupported conclusions, or unwarranted inferences from the Complaint. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir.1997).

    The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully" or that the alleged facts are "'merely consistent with a defendant's liability." *Ashcroft*, 556 U.S. at 678 (2009). Rather, a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the conduct alleged." *Id.* Determining whether a complaint contains facts that "state a

claim to relief that is plausible on its face" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *In re Schering Plough Corp. Intron*, 678 F.3d 235, 243-44 (3d Cir. 2012) (internal quotation marks omitted).

As discussed in the Motion section, it is not plausible that the parties would have made payment for the hypnosis video through Custom Club and not some other means, a material term of their supposed agreement. It is likewise not plausible that Defendant would have misrepresented that she was selling a fetish video when in fact she was offering a regular hypnotherapeutic service to help Plaintiff train for his chess game. It similarly is not plausible that Plaintiff's stalking and cyber-bullying of Defendant were just Plaintiff's efforts to post honest reviews of Defendant's services for future consumers to read. It is not plausible that Defendant did anything to subject herself to the jurisdiction of this Court. Rather, the entire scenario posited by Plaintiff is a desperate and unconvincing effort to rationalize bringing a suit that never should have been filed.

### 2.  Plaintiff is not entitled to Declaratory Relief

Title 28 U.S.C. § 2201 affords district courts the discretionary authority to grant declaratory relief in cases where doing so "(1) will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.,* 139 F.3d 419, 422 (4th Cir. 1998).

However, federal courts will not grant declaratory relief in instances where the record does not disclose an "actual controversy." *Evers v. Dwyer*, 358 U.S. 202, 203 (1958) (citing *Public Service Commission of Utah v. Wycoff Co.*, 344 U.S. 237, 73 (1941)). Here, there is no actual or pending threat for a defamation case being brought in the future by Defendant against

Plaintiff. Indeed, regardless of what he wrote about Defendant, the purpose of suing for

defamation is to collect damages, but because Plaintiff has admitted in another lawsuit he filed

that he has been certified by Social Security Administration is mentally ill, with a serious enough

bipolar condition to qualify for Social Security Disability Income, and because he appears to be

essentially an unemployable, insolvent ward of the government (who has petitioned the Third

Circuit for relief from paying filing fees), the incentive of recovering damages seems to be

lacking; and few trial lawyers would pursue such an action purely as a White Knight. *See Parker*

*v. Social Security Administration, et al.* attached hereto as Exhibit "A." Therefore, there is no

case or controversy before the Court dealing with the defamatory content *vel non* of Plaintiff's

statements about Defendant, and no basis for a Declaratory Order.

On the other hand, Plaintiff's claims for declaratory relief fail as a matter of law because

Plaintiff has not sufficiently alleged any of the required elements. Thus, Plaintiff has failed to

allege exactly what he said in his posts on the consumer review and other postings that he wants

the Court to declare are, or are not defamatory. Nowhere in the Amended Complaint does

Plaintiff advise the Court what the words are that he wants the Court to review to determine his

liability for defamation. This is completely contrary to the requirement that the issues subject to a

Declaratory Order be concise and well defined.

Defamation cases are not suitable for a potential defendant (as Plaintiff is in the context

of his request for a Declaratory Order in this case) to obtain an advance ruling declaring his tort

liability for defamation.  In *Dow Jones & Co. v. Harrods, Ltd.,* 237 F. Supp. 2d 394 (S.D.N.Y.

2002), the plaintiff, the publisher of the Wall Street Journal, commenced an action seeking a

relief under the Declaratory Judgment Act ("DJA")  that its published statements about the

defendant, Harrods, were non-actionable expressions of opinion and not defamatory. The court

9

dismissed the plaintiff's claim pursuant to Rules 12(b)(l) and (2), and cogently explained why a potential defendant in a tort case based on a state's law could not get an advance ruling on liability before the other party even brought suit. The court in *Dow Jones & Co* held that "where the purported use of the DJA seeks a declaration of non-liability to preemptively defeat actions grounded on tort claims involving rights already accrued by reason of alleged wrongful conduct, various courts have held that that application is not a warranted purpose of the DJA." *Id* at 426-27 citing *BASF Corp. v. Symington,* 50 F.3d 555, 559 (8th Cir. 1995) (holding that "where a declaratory plaintiff raises chiefly an affirmative defense, and it appears that granting relief could effectively deny an allegedly injured party its otherwise legitimate choice of the forum and time for suit, no declaratory judgment should issue.") *Morrison v. Parker,* 90 F. Supp. 2d 876, 880-81 (W.D. Mich. 2000); *Sun* Oil *Co. v. Transconrinema/ Gas Pipeline Corp.,* 108 F.Supp. 280, 282 (E. D. Pa. 1952), *affd,* 203 F.2d 957 (3d Cir. 1953); and 1 OB *Wright, Miller & Kane,* § 2765 at 638-39).

Moreover, declaratory relief here would not serve a useful purpose or resolve the controversy between the parties since if the words were defamatory, a full jury trial would repeat much of the proceedings. *Wilton v. Seven Falls Company,* 515 U.S. 277, 288 (1995).

In Count I, Plaintiff further alleges that he is entitled to injunctive relief "enjoining Defendant from bringing a defamation action against Plaintiff, in this court, for any conduct prior to the issuance of the injunction, as such an action would be issue-precluded and waived." Amend. Comp. at ¶ 38. Pennsylvania law provides that in order to establish the right to injunctive relief, a plaintiff must "establish that his right to relief is clear, that an injunction is necessary to avoid an injury that cannot be compensated by damages, and that greater injury will

result from refusing rather than granting the relief requested." *Boring v. Google Inc.*, 362 F. App'x 273, 282 (3d Cir. 2010) (citations omitted).

Plaintiff's claims for injunctive relief fail as a matter of law because Plaintiff has not sufficiently alleged any of the required elements to make out a claim for such relief. Plaintiff has failed to describe the writings in questions over which Defendant supposedly threatened Plaintiff with suit. Plaintiff believes he is entitled to a broad declaration affirming that "nothing he has written until the time of its ruling gives rise to a cause of action against him, by her, for defamation." Amend. Compl. at ¶ 37. Given his vagueness regarding the supposed defamatory statements, it is not clear what relief he is entitled to, as such relief could apply to everything he has written ever before the filing of this lawsuit. Second, Plaintiff failed to demonstrate that injunctive relief is an urgent necessity to avoid an injury that cannot be compensated in damages. *In re Joey's Steakhouse, LLC*, 474 B.R. 167 (Bankr. E.D. Pa. 2012).

### 3.   The Amended Complaint demonstrates there was no contract

To bring a claim for breach of contract under Pennsylvania law, "a plaintiff must allege: 1) the existence of a contract, including its essential terms, 2) breach of a duty imposed by the contract, and 3) resultant damages." *Vives v. Rodriguez*, 849 F. Supp. 2d 507, 515 (E.D. Pa. 2012) (citing *Omicron Systems, Inc. v. Weiner*, 860 A.2d 554, 564 (Pa.Super.2004)). Pennsylvania law holds that a contract is created only when there is mutual assent to the terms of a contract by the parties. *See Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor Control Bd.*, 739 A.2d 133, 136 (1999). Notice to terminate a contract must be clear and unambiguous. *See Accu-Weather, Inc. v. Prospect Commc'ns, Inc.*, 644 A.2d 1251, 1254 (1994) (citing *Eastern Milk Producers Co-op Ass'n, Inc. v. Lehigh Valley Co-op Farmers,* 568 F. Supp. 1205, 1207 (E.D. Pa. 1983)). Here the sole dispute was that Plaintiff insisted on paying through an adult

website that offered fetish videos for a hypnosis video that had nothing to do with his fetishes; and Defendant could not use the website because she was no longer affiliated with it. Plaintiff jumped the gun and did not inquire from Defendant if Defendant agreed to use that website for payment; and when Plaintiff found out Defendant could not use it, Plaintiff cancelled the sale that he had proposed. He withdrew, or rescinded his offer. There was no meeting of the minds, and no contract was ever formed.

One of the titles for the Counts in the Amended Complaint alludes to a claim for breach of contract. Yet the Amended Complaint states unambiguously that Plaintiff and Defendant never entered into any contract. Rather, the Amended Complaint pleads that before money changed hands, before Plaintiff even had a discussion about what would be included in the custom made chess-hypnosis video he wanted to hire Defendant to make, Plaintiff "*fired Defendant*" and "*declined the transaction.*" Amend. Compl. at ¶ 17. There never was a completed contract because Plaintiff aborted the transaction; and he therefore could have suffered no damages. Simply stated, Plaintiff well knew he had no breach of contract claim, and did not even try to describe one. Instead, the breach of contract claim is what Justice Scalia would call "jiggery-pokery." *See King v. Burwell*, 2015 WL 2473448 (2015).[12]

If anything, Plaintiff's position is ridiculous since he had no complaint about Defendant, or the service Defendant was willing to perform. Rather, Plaintiff puts forth the most laughable contention that although it was never bargained for, or even discussed by the parties, he wanted to send payment through an adult-services web site payment program with which Defendant was

---

[12] "*Jiggery-pokery*" means a manipulative or slyly dishonest act – synonyms include "trickery" or "hocus-pocus." *See* http://www.thedailybeast.com/articles/2015/06/25/what-scalia-s-jiggery-pokery-means0.html

not affiliated. When Defendant suggested that Plaintiff pay thorough PayPal, he called off the whole deal. If Plaintiff did not like PayPal, he could have sent a check, wired the money, used Western Union, or a number of other methods. The transmission of funds is rarely a material clause in any contract for services, and it certainly was not a condition here. It is an insult to the Court that Plaintiff could even in jest think his outrageous allegation would survive scrutiny. His excuse for terminating the deal therefore is as much a sham as everything else associated with him and his claim.

Additionally, a breach of contract claim needs damages. Plaintiff's contention that it would cost him $325,000 to train and direct an actress to re-create a hypnosis video to improve his chess game is absurd and without factual backing. Amend. Compl. at ¶ 44. However, as the email message from Defendant revealed in the Amended Complaint at ¶ 16 when she admitted she personally was unacquainted with chess: "I don't know that much about chess. [C]an you tell me when you win how you feel?"  Therefore, the damages Plaintiff alleges are mindless and not based on anything real.  Also, given the fact that it was Plaintiff himself who terminated the transaction, there was no contract, and thus there can be no damages for breach of an imaginary contract.

### 4. Plaintiff pleads no facts demonstrating Fraudulent Misrepresentation by Defendant

Fed. R. Civ. P. 9(b) requires that the party alleging fraud "must state with particularity the circumstances constituting fraud." This rule goes beyond the minimal pleading requirements of Fed.R.Civ.P. 9 *Bennett v. Itochu Int'l, Inc.*, 682 F. Supp. 2d 469, 479 (E.D. Pa. 2010)  In Pennsylvania, fraud-based claims require proof of the following elements by clear and convincing evidence: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4)

13

with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. *EBC, Inc. v. Clark Bldg. Sys., Inc.,* 618 F.3d 253, 275 (3d Cir. 2010).

Plaintiff alleges fraudulent misrepresentation because he was hoping to purchase a video from Defendant through CustomsClub.com, an adult-fetish website catering to custom-made videos. Amend. Compl. at ¶ 12.  Plaintiff killed the deal when Defendant explained that when she first arrived in Hollywood, she needed work, but that Defendant had long since severed her ties with CustomsClub.com, and had asked it to take down all references to her, but her requests were ignored. Amend. Compl. at ¶ 16.  Plaintiff contends that even though the vehicle for payment was never discussed until he offered to pay through the adult-fetish website with which Defendant had no current affiliation, and even though Defendant was willing to be paid by PayPal or check, Plaintiff viewed this as a breach of contract worthy of his suit.  Defendant never represented to Plaintiff that she would make anything but a legitimate hypnosis video to assist him in improving his chess performance per his request. At no point did Defendant imply that she would provide, nor did Plaintiff request, a video that was sexual in nature, yet he claims that Defendant lied and/or intended to mislead him about being an adult fetish model. In fact, Defendant's former profession is wholly irrelevant as to their alleged agreement. Because Plaintiff cancelled the transaction himself, prior to payment and prior to performance by either party, Plaintiff can demonstrate no damages, a required element for fraudulent misrepresentation.

### 5. Plaintiff Pleads No Facts Demonstrating that Defendant Defamed Him By Linking to a Third-Party Website

Plaintiff pled in the Amended Complaint that following his "firing" of Defendant from the video project (before it started),  Plaintiff decided to post negative, harassing, and highly offensive online reviews of Defendant as a hypnotist and person, as well as "speaking out about

14

his experience with Defendant" on her social-media pages. Amend. Compl. at ¶ 20. When Defendant was informed that Plaintiff had trashed her on the website RipoffReport.com, Defendant posted a rebuttal that noted that Plaintiff had never been a customer or bought anything from her, and she added to her rebuttal a link to the "ED" page, which offered a history of Plaintiff's wars and arguments with other users of the Internet, Plaintiff's sordid reputation, and a discussion of some of Plaintiff's prior lawsuits. Amend. Compl. at ¶ 24.  Plaintiff contends that Defendant's hyperlink to "ED" page forms the basis of his Defamation claims against Defendant. *Id.*

Under both statutory and judge made law, a person cannot be held liable for posting on the Internet a hyperlink to, or repeating a quote authored by another person that was published on a website, regardless of the content; and the immunity from defamation claims afforded such users of the Internet is absolute.  *See* Section 230 of the Communications Decency Act of 1996, 47 U.S.C. § 230 ("Section 230"); *see also Parker v. Google, Inc.*, 422 F. Supp. 2d 492, 504 (E.D. Pa. 2006) *aff'd*, 242 F. App'x 833 (3d Cir. 2007) ("Congress granted most Internet services immunity from liability for publishing false or defamatory material so long as the information was provided by another party. As a result, Internet publishers are treated differently from corresponding publishers in print, television and radio."); *Barrett v. Rosenthal*, 40 Cal. 4th 33 (2006) (ruling that user of interactive computer services was immune from defamation liability for posting information passed to her by a third-party publisher); *Zeran v. America Online, Inc.*, 129 F.3d 327, 331–33 (4th Cir. 1997) ("Subjecting Internet service providers and users to defamation liability [for third-party published content] would tend to chill online speech.").

In *Barrett*, Plaintiff sued Defendant for republishing what she considered was a defamatory email onto a third party website. *Id.* The Supreme Court held that Defendant was a

"user" as defined by the Communications Decency Act, and therefore did not re-publish content for the purposes of bringing a defamation claim. *Id.* Rather, the Supreme Court told Plaintiff that she would have to sue the originator of the defamatory Internet publication. *Id; see also Mitan v. A. Neumann & Assocs., LLC*, 2010 WL 4782771, at *5 (D. N.J. Nov. 17, 2010) (holding CDA immunity applies to Defendants who merely forwarded a supposedly defamatory third-party newsprint article by email); *Novins v. Cannon*, 2010 WL 1688695, at *2 (D. N.J. Apr. 27, 2010) (holding CDA immunity applies to all defendants who merely republished online first defendant's defamatory statement); *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 28 (2d Cir. 2015) (holding "In short, a plaintiff defamed on the internet can sue the original speaker, but typically 'cannot sue the messenger'") (citing *Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 672 (7th Cir. 2008)).

Despite the settled law to the contrary, the Complaint's defamation Count seeks to hold Defendant liable for linking to, or re-publishing matter that Plaintiff deems defamatory that appeared on the "ED" page.  Even assuming the Complaint's version of the facts is true, Plaintiff's defamation claim cannot survive because Defendant is absolutely immune from liability for any otherwise defamatory statements contained on the Internet that Defendant did not author herself and as the Complaint pleads, the content Plaintiff deems defamatory on "ED" page was there at least as early as 2011 (Amend. Compl. at ¶ 28), and Plaintiff does not contend that Defendant authored comments about him years before he first contacted her in 2015.  *See* 47 U.S.C. § 230(c)(1).

III.   **Conclusion**

For the foregoing reasons, Defendant requests that this Court grant her motion and

Dismiss Plaintiff's Amended Complaint.

Respectfully submitted,

Gary Green, Esquire
Attorney I.D. PA 15730
**SIDKOFF, PINCUS & GREEN, P.C.**
2700 Aramark Tower
1101 Market Street
Philadelphia, PA  19107
(215) 574-0600
(215) 574-0310 (fax)
**Attorney for Defendant Jacqui Holland**

Dated: July 20, 2015

17

## CERTIFICATE OF SERVICE

I, Gary Green, hereby certify that on this 20th of July, 2015, a true and correct copy of

*Defendant Jacqui Holland's Motion to Dismiss Plaintiff's Amended Complaint* pursuant to Fed.

R. Civ. P. 12(b)(2) and 12(b)(6) and Memorandum of Law was served on all parties, via first-

class mail and by electronic filing, postage prepaid to the following address:


Gordon Roy Parker
4247 Locust Street, #119
Philadelphia, PA 19104


Respectfully submitted,


Gary Green, Esquire
Attorney I.D. PA 15730
**SIDKOFF, PINCUS & GREEN, P.C.**
2700 Aramark Tower
1101 Market Street
Philadelphia, PA 19107
(215) 574-0600
(215) 574-0310 (fax)
**Attorney for Defendant Jacqui Holland**

Dated: July 20, 2015

# EXHIBIT A



**IN THE UNITED STATES COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLANIA**

| | | |
|---|---|---|
| **GORDON ROY PARKER,** 4247 Locust Street, #119 Philadelphia, PA 19104 (267) 298-1257 SnodgrassPublish@aol.com, Plaintiff, v. **SOCIAL SECURITY ADMINISTRATION,** 43rd and Chestnut, Philadelphia, PA 19104, and **PENSION BENEFIT GUARANTY CORPORATION,** 2500 Grubb Road, #21, Wilmington, DE 19810, Defendants | : : : : : : : : : : : : : : : : : : : | **Case No:** **15 3453** **Complaint To "End Social Security As We Know It."** (constitutional challenge Rule 5.1) |

**COMPLAINT FOR VIOLATIONS OF THE REHABILITATION ACT OF 1973**

Plaintiff **Gordon Roy Parker** sets forth the following:

**THE CAST**

1.    Plaintiff is Gordon Roy Parker.  He has been on SSDI since 2014, having been awarded his back benefits in April, 2015.  His monthly benefit is $867.00 a month, from which his "mandatory" participation in Medicare will siphon approximately $138.00 a month, leaving him with $729.00 a month on which to survive.

2.    Defendants are the Social Security Administration ("SSA") and the Pension Benefit Guaranty Corporation ("PGBC").

**THE PLOT**

3.    This is a federal lawsuit, an ***as-applied*** challenge to the benefits-calculation formula for retirees, those on SSI, and those receiving pensions insured by PGBC with Plaintiff's hard-earned tax ***dollar*** [sic] (approximately his yearly federal tax liability these days).

1

4. According to Defendant SSA's own *Social Security History* website, President Roosevelt made clear that benefits had to be *earned!* Check it out:



how the courts would see this new function of government, the framers of the AAA deliberately placed the tax provisions and the subsidy provisions in separate titles of the act, so they could argue that they were not necessarily connected to each other; that is, so they could argue that the purpose of the tax was not to control production but was merely to raise revenue. This was the same strategy adopted by the framers of the Social Security Act, as can be seen in the separate Titles II and VIII of the original Social Security Act.

The old-age insurance system introduced in the Social Security Act was designed, at a public policy level, to be a contributory social insurance program in which contributions were made by workers to what was called the "old age reserve account," with the clear idea that this account would then be the source of monies to fund the workers' retirement. Actuarial studies were done to determine what the contribution rate would need to be in order to have sufficient reserves in the account to pay anticipated benefits. In the popular understanding of the program, the contributions established an "earned right" to the eventual benefits. President Roosevelt strenuously objected to any attempt to introduce general revenue funding into the program. His famous quote on the importance of the payroll taxes was: "*We put those payroll contributions there so as to give the contributors a legal, moral, and political right to collect their pensions and unemployment benefits. With those taxes in there, no damn politician can ever scrap my social security program.*" [2]

http://www.ssa.gov/history/court.html
Retrieved June 18, 2015 12:58 am

5. Amazing oratory from Roosevelt about the need to tie benefits to wages notwithstanding, this Act, like most of his struck-down *New Deal*, is unconstitutional.

6. Undeterred by the Constitution, Roosevelt figured out a way to make the Act repeal-proof:

> **A President Tries to Pack a Court-**
>
> In early 1937 President Roosevelt made what turned out to be the biggest political blunder of his career, and yet it was a blunder that would have fortuitous, even pivotal, importance for the fate of Social Security.
>
> Federal judges are appointed for life. The Supreme Court of the 1930s was the most elderly in the history of the Republic, with an average age of over 71. President Roosevelt would derisively refer to them as "those nine old men." Actually, he only had four of them in mind. The Court was split down the middle in political terms. On the liberal side were three justices sympathetic to the New Deal programs (Brandeis, Stone and Cardozo); on the conservative side were four justices who voted against everything the Congress and the Administration tried to do (McReynolds, Butler, Van Devanter and Sutherland). In the middle were Chief Justice Charles Evans Hughes and Justice Owen Roberts, who were often "swing votes" on many issues. In the spring of 1935 Justice Roberts joined with the conservatives to invalidate the Railroad Retirement Act. In May, the Court threw out a centerpiece of the New Deal, the National Industrial Recovery Act. In January 1936 a passionately split Court ruled the Agricultural Adjustment Act unconstitutional. In another case from 1936 the Court ruled New York state's minimum wage law unconstitutional. The upshot was that major social and political reforms, including social insurance programs, appeared headed for defeat. This despite the obvious will of the electorate who returned Roosevelt to office in 1936 with the largest landslide in history.

7.    So we have, ***in the government's own words,*** the sordid legislative history of the Social Security Act of 1937, whereby tying benefits to earnings placated the power-tripping conservatives who cannot stand the idea that a poor person might be able to exist under something other than the threat of poverty, homelessness, starvation, and preventable death inherent in unbridled capitalism.

8.    Not sufficient to trust the judiciary, and in a manner which would make the authors of the PATRIOT ACT blush, Roosevelt then issued a veiled threat to involuntarily retire the judicial nuisance that was the SCOTS monopoly, one generally credited with allowing the Act to survive.

President Roosevelt's response to all of this was stunning and unexpected. On February 5, 1937 he sent a special message to Congress proposing legislation granting the President new powers to add additional judges to all federal courts whenever there were sitting judges age 70 or older who refused to retire. Couching his argument as a reform to help relieve the workload burden on the courts, President Roosevelt's unusually blunt language made it clear what he really had in mind: *"A part of the problem of obtaining a sufficient number of judges to dispose of cases is the capacity of the judges themselves. This brings forward the question of aged or infirm judges--a subject of delicacy and yet one which requires frank discussion. In exceptional cases, of course, judges, like other men, retain to an advanced age full mental and physical vigor. Those not so fortunate are often unable to perceive their own infirmities... A lower mental or physical vigor leads men to avoid an examination of complicated and changed conditions. Little by little, new facts become blurred through old glasses fitted, as it were, for the needs of another generation; older men, assuming that the scene is the same as it was in the past, cease to explore or inquire into the present or the future."* [3]

The practical effect of this proposal was that the President would get to appoint six new Justices to the Supreme Court (and 44 judges to lower federal courts) thus instantly tipping the political balance on the Court dramatically in his favor. The debate on this

### Anti-Discrimination Laws And The SSA

9. Having just gotten around to canonizing the Miranda warning, and clarifying the language of the Second Amendment, and on a planet where the can **opener** was invented a full half-century after the tin can, justices has been delayed and denied to the collateral damage endured by Plaintiff, and those similarly situated.

4



10.    Plaintiff avers, based on watching video the *2015 Academy Awards* and reading it on the internet, that women earn less money than men in their lifetimes.  Not surprisingly, the average retirement benefit is *$300.00+ greater for men than for women*.

11.    The government, as a matter of public policy, uses presumed discrimination as the constitutional basis for affirmative action, equal pay, and other statutes.

12.    Whistleblowers like Plaintiff earn less money in their lifetimes than those who *don't snitch*.

13.    (Whistleblowers  + anti-poverty)  >  any other compelling public interest.

14.    Whistleblowers  >  Jerry Sandusky and his $59,000+ pension from the Commonwealth.

**The As-Applied Challenge (General)**

15.    Plaintiff is *not* appealing the findings of the SSA, as this lawsuit is beyond that scope.  He is challenging the constitutionality of the benefits-calculation provision of the SSA, and of private pensions ensured by the PBGC.

16.    To quote what Arquette would have said, had her speechwriters thought of it: ***why is the government <u>punishing</u> elderly women a second time for discrimination?***

17.    Even without civil rights legislation clearly creating a circumstance whereby targets of discrimination are punished under color of law with a reduced retirement (or disability) check, the retirement-benefits calculation violates the Equal Protection provision of the Fourteenth Amendment, with no possible compelling interest offsetting elderly poverty, employment discrimination, or whistleblower-silencing, assuming that was even the consequence of the least restrictive means.

**COUNT ONE:**
**TITLE VII AND EQUAL-PROTECTION VIOLATIONS (BOTH DEFENDANTS, GENERAL)**

18.    Plaintiff incorporates by reference, as if fully set forth verbatim herein, the entire contents of all previous paragraphs.

19.    Plaintiff's lifetime earnings have been reduced by at least one act of provable discrimination.  Indeed, he just sued Kelly Services (***"The Kelly GIRL People"***) and Independence Blue Cross ("IBX") under the Rehabilitation Act, for not taking Plaintiff seriously when he said he wishes to work.  Should the need to prove more exist, if this Court asks via leave to amend, Plaintiff shall give plenty more on amendment.  Given the real retaliation risks of doing so, Plaintiff hopes this Court will simply stipulate that he is a targeted class.

20.    Because SSA and private pensions (for which Plaintiff is less likely to qualify due to discrimination), tie retirement (and disability) benefits to wages, they have run afoul of Title VII of the Civil Rights Act of 1964, the Equal Pay Act of 1991, the Rehabilitation Act of 1973, and The Americans With Disabilities Act of 1990, among other statutes, as well as the Equal Protection Clause.

21.    Like Bill Clinton's portrayer said during an SNL skit about his not meeting Megan Fox, who was in the studio at the time: *that's just **wrong**!* It's also been illegal since no later than 1963, which is why Plaintiff states this claim for relief on this basis.

22.    Absent discrimination, Plaintiff's monthly SSDI check would approach *two thousand dollars a month*. The same is true for the more sympathetically situated women, minorities, other disabled, felons, and others not named Jerry Sandusky.

23.    While Plaintiff is entitled to an SSDI check based on his *imputed income* (the one that would have been used to determine his child support payments) of almost "two dimes a month," he concedes the compelling interest in preserving the system while allowing time for it to phase out its illegal parts. To this extent, Plaintiff concedes a compelling interest except to the extent that his monthly benefit is beneath the federal poverty level of $11,770.00 in annual income for 2015, or $980.83 a month, to which he asserts entitlement based the dual public interests of anti-poverty and anti-discrimination.

24.    Plaintiff is entitled to injunctive relief sufficient to terminate the current benefits-calculation formula, replacing it with one which a) is not tied at all to wages, and b) in transition, which does not keep even one benefit recipient in poverty while Jerry Sandusky is collecting his $59,000 a year. He is further entitled to c) his tax *dollar* not being used to fund equally unconstitutional pensions via PBGC.

25.    Plaintiff is proposing that a new, legal system be phased in by the year 2070, so that anyone currently in the workforce now retains the option of the current system, while the government offers buyouts to speed up the process.

## COUNT TWO:
## ADA/REHABILITATION AND EQUAL-PROTECTION VIOLATIONS (SSA, DISABILITY)

26.    Plaintiff incorporates by reference, as if fully set forth verbatim herein, the entire contents of all previous paragraphs.

27. Under the current SSA benefit-calculation formula, Plaintiff could not have been determined to be disabled prior to 2011, not because he was not disabled, but because he was earning too much to qualify for benefits.

28. Plaintiff has been disabled since his suicide attempt on Sunday, July 8, 1984 at or around 4:20 p.m. He has bipolar disorder.

29. Plaintiff has been discriminated against and otherwise had his income reduced due to disability, due to increasing stigmatization, ever since his diagnosis. Examples of how Plaintiff is perceived include his being called names, in public, without shame from the speaker, like *a\*\*hole, overbearing, psychotic, sociopathic, bitter, whining, crazy, Fr00Tl00P* (on USENET), *batsh\*t crazy*, and *unemployable*, the final one told to this very Court in 2003, by the University of Pennsylvania (who employees thousands of secretaries), with Judge Anita Brody agreeing, saying "[Plaintiff's] employability has always been in question," when she ordered the Rule 35 examination in the course of Plaintiff's Title VII lawsuit.

30. Simply put, no one likes Plaintiff and no one will hire him, despite his many skills, due to his attitude and mental illness. It merely took until 2011 for his many skills to no longer allow him to fall over the "cash cliff" of the SSA's income limit.

31. Unlike workman's compensation, SSDI does not provide a *reduced earnings benefit*, even in an extreme case like Plaintiff's.

32. Plaintiff's current lawsuit against *The Kelly GIRL People* and IBX stems from an incident in February, 1994, by which both Defendants terminated Plaintiff, explicitly citing his (alleged) "disorientation" as the grounds for termination.

33. Plaintiff was punished a second time for this incident by Defendant SSA, because he did *not* take the other defendants at face value, did *not* take the easy way out, and did not apply for SSDI. He had no reason to: he could still find work, albeit at the reduced rates of $7.50-9.00 an hour, thus greatly

reducing his benefit check. Plaintiff was at his peak income from 1987-1993, and had lost four years of work credits (1983-1986) due to having been employed in the family business, literally against his will. Indeed, had Plaintiff waited but a year longer, he would be on SSI, and not even allowed to accumulate wealth without sacrificing his benefits. Though he lacks standing, Plaintiff avers that SSI should be abolished and replaced with universal SSDI, imputing at least *minimum wage.*

34.    If this Court truly believes that Plaintiff would ever have blown a single whistle, thus exacerbating his limited options for employment, had he known he would wind up with an "early-retirement" check of $867.00 a month instead of a lifetime SSDI check which would now approach "two dimes," it is mistaken. Is there not a public interest in encouraging whistleblowers? Because stigma is what makes Plaintiff unemployable due to disability, he refers to his benefit as *whisability*.

35.    Plaintiff avers that the only three constitutionally sound classifications for workers are *employed, retired*, and *disabled*, except where a worker has consciously refused offers of employment. "Disability" is a matter of time when one lacks housing, food, and proper medical care, with delays costing not just lives, but a lot of money that would not be necessary were everyone's benefit check at parity with poverty.

36.    Because starvation and suicide are not options, Plaintiff further avers that *poverty itself* a breach of the social contract, simply due to the increased secondary costs to society when its inevitable effects kick in, without the economically mitigating factors of death and starvation to reduce costs. Theft, of course, is illegal, which leaves this lawsuit as the only real option, save for an act of maturity by Congress, for which Plaintiff is not holding his breath. This is not "legislating from the bench," but rather the judiciary's proper role of *judging* legislation from the bench, something the fearful 1937 court could not do, as per the government's own words.

37.    Plaintiff's constitutional harm and damages are simple: the inability to travel, in this case to rebuild his life in privacy, secondary to his having been *cyberstalked* for close to twenty straight years,

including defamatory allegations that he is a pedophile, more imputations of mental illness, and the publication of his address and likeness to incite offline harassment.  Regarding 36) above, Plaintiff is not suicidal, for if he were, he would be challenging to apply Oregon's assisted-suicide statute nationally, under equal protection grounds.  He asks only that the government stop breaking the law so that his benefits allow him the proper exercise of his citizenship.

38.   Plaintiff is entitled to an order enjoining the SSA from calculating retirement and disability benefits in a manner which runs afoul of the constitution.  Specifically, he is entitled to an order requiring the SSA to change its benefit formula for *all* Americans, to where disability is determined solely by medical capability, and income is imputed for those months or years where the disability resulted in reduced income, in this case from $22,000.00+ (in 1993) to $9,000.00+ (since).

39.   Plaintiff seeks no "earthquake" that would double his benefit check, but asserts that he is entitled to $980.83 per month, sufficient to keep him at parity with the poverty level, and that this benefit *not* include any deductions for Medicare.

40.   Plaintiff is also entitled to *not* enroll in Medicare until he is sixty-five, or takes full retirement at seventy, should he live that long (see below).

41.   Plaintiff further asserts an equal-protection violation, on the basis of his SSDI check automatically converting to a retirement check at age sixty-five, rather than allowing Plaintiff to gain the much-needed benefit that comes with retiring at seventy.

**COUNT ONE:**
**EQUAL-PROTECTION VIOLATIONS (GEOGRAPHY)**

42.   Plaintiff incorporates by reference, as if fully set forth verbatim herein, the entire contents of all previous paragraphs.

10

## Three Retirees Walk Into A Bar In Florida:
## <u>One from New York City, Iowa, And Kansas</u>

43.   The retiree from New York is the only one who can afford to drink there, because his check was inflated by his geographically inflated income, in clear violation of the Fourteenth Amendment. Plaintiff states this claim for relief on this basis.

44.   Plaintiff is entitled to have his income imputed based on his having worked in New York City his entire life, as a person not disabled.

45.   Plaintiff is entitled to injunctive relief sufficient to terminate the actionable conduct.

### <u>PRAYER FOR RELIEF</u>

Plaintiff prays to this Court for the following relief:

1.   An increase in his monthly SSDI benefit to *at least* the poverty level, but also to his imputed-income level, as determined by this court.

2.   An order enjoining the PBGC from insuring privately funded pensions.

3.   That his tax *dollar* no longer be used to punish targets of discrimination in disability and retirement, via a court order to the SSA and PBGC to devise a constitutionally sound benefits-calculation formula.

4.   A declaration that Plaintiff has been disabled for his entire working life, via overwhelming preponderance of the evidence, and the *person-not-living-under-a-rock* standard.

5.   An order requiring the SSA to calculate disability based on medical, not financial, considerations, and to design a system similar to the reduced-earnings benefit for workman's compensation, for both its SSDI benefits, and retirement work-credit formula.

6.   Anything less would be uncivilized, in violation of the social contract, and so prohibitively expensive that the entire system is projected to collapse within two decades if not changed.   Plaintiff is here not to change the system, but to have an illegal system shut down.

ablic

---

**JURY TRIAL DEMANDED**

Plaintiff exercises his right to trial by a jury of his fellow established pillars of the community.

This the 19th day of June, 2015

Gordon Roy Parker, Pro Se
4247 Locust Street, #119
Philadelphia, PA 19104
(267) 298-1257
SnodgrassPublish@aol.com
**PLAINTIFF**